**R. H. MACY & CO., Inc., Plaintiff,**
v.
**UNITED STATES, Defendant.**
**C.D. 3733; Protest No. 66/61100–11029–66.**

United States Customs Court,
Second Division.
March 11, 1969.

Brooks & Brooks, New York City (Eugene F. Blauvelt, New York City, of counsel), and Sharretts, Paley, Carter & Blauvelt, by Howard Clare Carter, New York City, attys., Allerton deC. Tompkins, John D. Rode, Barnes, Richardson & Colburn, New York City, Glad & Tuttle, Los Angeles, Cal., Lane, Young & Fox, Siegel, Mandell & Davidson, New York City, and Stein & Shostak, Los Angeles, Cal., assoc. counsel, for the plaintiff.

William D. Ruckelshaus, Asst. Atty. Gen., Bernard J. Babb, New York City, for defendant.

Before RAO, FORD, and NEWMAN, Judges.

RAO, Chief Judge:

Placed in controversy by the above enumerated protest is the proper classification for customs duty purposes of a shipment from France invoiced as embroidered curtains in chief value of acetate fabric and hand-painted panels in chief value of polyester fabric. The customs authorities classified the embroidered curtains within the provisions of item 365.85 of the Tariff Schedules of the United States and assessed duty thereon at the rate of 42½ per centum ad valorem. The hand-painted panels were classified within the purview of item 367.60 of said tariff schedules and subjected to duty at the compound rate of 25 cents per pound plus 30 per centum ad valorem.

The sole claim of plaintiff, all other claims having been abandoned, is that the embroidered curtains and the hand-painted panels are properly subject to classification in item 772.35 of the Tariff Schedule of the United States which provides duty at the rate of 12½ per centum ad valorem.

The specific language of the statutory provisions above referred to, together with certain applicable prefatory headnotes, are here set forth for ready reference.

Classifications by the customs authorities:

SCHEDULE 3.—TEXTILE FIBERS AND TEXTILE PRODUCTS

*Schedule 3 headnotes:*

   1.  This schedule does not cover—

      \*      \*      \*      \*      \*      \*      \*      \*      \*

   (iv) footwear, headwear, gloves, handbags, pillows, mattresses, and other articles of textile materials provided for in schedule 7.

   2.  For the purposes of the tariff schedules—

   (a) the term "textile materials" means—

   (i) the fibers (cotton, other vegetable fibers, wool and hair, silk, and man-made fibers) provided for in part 1 of this schedule.

   (ii) the yarn intermediates and the yarns provided for in part 1 and part 4 (elastic yarns) of this schedule,

   (iii) the cordage provided for in part 2 and part 4 (elastic cordage) of this schedule,

   (iv) the fabrics provided for in part 3 and part 4 of this schedule,

   (v) braids, as defined in headnote 2(f), *infra*, and

   (vi) articles produced from any of the foregoing products;

      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

PART 5.—TEXTILE FURNISHINGS

      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

Subpart C.—Tapestries, Linens, and Other Furnishings

*Subpart C headnotes:*

   1.  For the purposes of this subpart, the term *"furnishings"* means curtains and drapes, including panels and valances; towels, napkins, tablecloths, mats, scarves, runners, doilies, centerpieces, antimacassars, and furniture slipcovers; and like furnishings; all the foregoing, of textile materials, and not specially provided for.

\* \* \* \* \* \* \* \* \* \*

Lace or net furnishings, whether or not ornamented, and other furnishings, ornamented:

Handmade-lace furnishings:

\* \* \* \* \* \* \*

Other furnishings, ornamented:

\* \* \* Of cotton ............................. \* \* \*

\* \* \* \* \* \* \*

365.85 Other ................................ 42.4% ad val.

Other furnishings, not ornamented:

\* \* \* \* \* \* \*

Of man-made fibers:

\* \* \* Knit (\* \* \*) ...................... \* \* \*

\* \* \* \* \* \* \*

Other:

\* \* \* Of glass ................................ \* \* \*

367.60 Other ................................ 25¢ per lb. + 30% ad val.

Explanatory of the term "man-made fibers", the following is quoted from said tariff schedules:

Schedule 3, part 1, subpart E, headnotes:

\* \* \* \* \* \* \* \* \* \*

2. (a) For the purposes of the tariff schedules, the term *"man-made fibers"* refers to the filaments, strips, and fibers covered in this subpart.

(b) Subject to the limitations set forth in headnotes 1 and 3 of this subpart, the respective provisions in this subpart for filaments, strips, and fibers cover such articles whether they are formed by extrusion or by other processes from substances derived by man from cellulosic or non-cellulosic materials by chemical processes, such as, but not limited to, polymerization and condensation;

(c) \* \* \* For the purposes of the provisions of the tariff schedules applicable to articles of man-made fibers, glass filaments and glass fibers shall be treated as man-made fibers only if they have been made into yarns or cordage, or if they are present in fabrics or other articles in the form of yarns or cordage.

3. For the purposes of this subpart—

(a) the term *"filaments"* embraces monofilaments, plexiform filaments, and grouped filaments, however produced;

(b) the term *"monofilaments"* embraces single filaments (including single filaments of laminated construction or produced from two or more filaments fused or bonded together), whether solid or hollow, whether flat, oval, round, or of any other cross-sectional configuration, which are not over 0.06 inch in maximum cross-sectional dimension;

\* \* \* \* \* \* \* \* \* \*

(d) the term *"strips"* embraces strips (including strips of laminated construction), whether or not folded lengthwise, twisted, or

crimped, which in unfolded, untwisted, and uncrimped condition are over 0.06 inch but not over one inch in width and are not over 0.01 inch in thickness;

\* \* \* \* \* \* \* \* \* \*

(f) the term *"fibers"* includes filaments and strips, as defined above, in noncontinuous form, and any other fibrous structure suitable for the manufacture of textiles;

\* \* \* \* \* \* \* \* \* \*

As claimed by plaintiff herein:

## SCHEDULE 7.—SPECIFIED PRODUCTS; MISCELLANEOUS AND NONENUMERATED PRODUCTS

\* \* \* \* \* \* \* \* \* \*

## PART 12.—RUBBER AND PLASTICS PRODUCTS

*Part 12 headnotes:*

1. For the purposes of the tariff schedules—

(a) the term *"rubber"* refers to rubber, as defined in part 4B of schedule 4;

(b) the term *"plastics"* refers to—

(i) synthetic plastics materials as defined in parts 1C and 4A of schedule 4,

(ii) polyurethane,

(iii) natural resins,

(iv) protein substances, such as casein compounds,

(v) regenerated cellulose,

(vi) vulcanized fiber, and

(vii) reinforced or laminated plastics as defined in subpart A of this part, but does not include rubber; and

(c) the term *"rubber or plastics"* means rubber, plastics, or combinations of rubber and plastics.

\* \* \* \* \* \* \* \*

Subpart C.—Specified Rubber and Plastics Products

\* \* \* \* \* \* \* \*

772.35 Curtains and drapes, including panels and valances; napkins, table covers, mats, scarves, runners, doilies, centerpieces, antimacassars, and furniture slipcovers; and like furnishings; all the foregoing of rubber or plastics ................................12.5% ad val.

The definition of "plastics" referred to above in part 12 headnotes of schedule 7 reads—

Schedule 4, part 1, subpart C, headnote 3:

3. The term *"plastics materials"* in item 405.25 embraces products formed by the condensation, polymerization, or copolymerization of organic chemicals and to which plasticizers, fillers, colors, or extenders may have been added. The term includes, but is not limited to, phenolic and other tar-acid resins, styrene resins, alkyd and poly-

ester resins based on phthalic anhydride, coumarone-indene resins, urethane, epoxy, toluene sulfonamide, maleic, fumaric, aniline, and polyamide resins, and other synthetic resins. The plastic materials may be in solid, semi-solid, or liquid condition, such as flakes, powders, pellets, granules, solutions, emulsions, and other basic forms not further processed.

Schedule 4, part 4, subpart A, headnote 2:

2. The term *"synthetic plastics materials"*, in this subpart, embraces products formed by the condensation, polymerization, or co-polymerization of organic chemicals and to which plasticizers, fillers, colors, or extenders may have been added. These products contain as an essential ingredient an organic substance of high molecular weight; are capable, at some stage during processing into finished articles, of being molded or shaped by flow; and are solid in the finished article. The term includes, but is not limited to, such products derived from esters of acrylic or methacrylic acid; vinyl acetate, vinyl chloride resins, polyvinyl alcohol, acetals, butyral, formal resins, polyvinyl ether and ester resins, and polyvinylidene chloride resins; urea and amino resins; polyethylene, polypropylene, and other polyalkene resins; siloxanes, silicones, and other organo-silicon resins; alkyd, acrylonitrile, allyl, and formaldehyde resins; and cellulosic plastics materials. These synthetic plastics materials may be in solid, semi-solid, or liquid condition such as flakes, powders, pellets, granules, solutions, emulsions, and other basis crude forms not further processed.

---

Defendant's exhibit A was received in evidence as representative of the merchandise in issue referred to as embroidered acetate curtains. Defendant's exhibit B was received in evidence as representative (except for its irregular outline) of the hand-painted polyester panels in controversy.

All other exhibits received in evidence will be referred to as necessary in the course of the decision.

It is the position of plaintiff herein that all facts necessary to a decision in its favor were contained in a stipulation of facts entered into by the parties, which stipulation was received in evidence as joint exhibit 1–A. It reads as follows:

"STIPULATION"

IT IS HEREBY STIPULATED AND AGREED by and between the parties hereto, subject to the approval of the Court, that the merchandise assessed with duty at 42.5% ad valorem under item 365.85, TSUS, consists of embroidered curtains in chief value of acetate fabric which was woven from an acetate yarn which was spun from man-made fibers of cellulose acetate.

IT IS FURTHER STIPULATED that cellulose acetate, in its basic crude form, and not further processed, is a synthetic plastic material as defined in Schedule 4, Part 4, Subpart A, Headnote 2, TSUS, and, in basic crude form, is provided for by name, item 445.20, TSUS.

IT IS FURTHER STIPULATED that the merchandise assessed with duty at 25 cents per pound and 30% ad valorem under item 367.60, TSUS, consists of hand-painted panels in chief value of polyester fabric which were woven from a polyester yarn, which were spun from man-made fibers of polyester.

IT IS FURTHER STIPULATED that polyester, in its basic crude form and not further processed, is a plastic material as defined in Schedule 4, Part 4, Subpart A, Headnote 2, TSUS, or in Schedule 4, Part 1, Subpart C, Headnote 3, TSUS, (depending upon the chemical nature of the products from whence derived) which, in crude form, is provided for as one of the plastic materials named in items 445.05 to 445.75, inclusive, Schedule 4, Part 4, Subpart A, TSUS, or if obtained, derived, or manufactured from a benzenoid product, under item 405.25, as a plastic material, Schedule 4, Part 1, Subpart C, TSUS.

IT IS FURTHER STIPULATED that the protest is limited to the above described merchandise and to the claim that said curtains and said panels should be classified under item 772.35, TSUS, at 12.5% ad valorem.

The plaintiff takes the position that there were three primary determinations made by the classifying officer in connection with the controverted merchandise, namely—

1. The imported articles were curtains and panels.

2. They were composed of textile materials.

3. They were *not specially provided for.* [italics quoted]

Plaintiff challenges the correctness of only the third of said determinations. It takes the position that inasmuch as the basic material of which the merchandise was composed consists of plastics, the curtains and panels in issue are specially provided for in item 772.35 and, therefore, are precluded from classification in items 365.85 and 367.60 by virtue of headnote 1 to subpart C of schedule 3 which would cover only curtains or drapes, which are not specially provided for.

Defendant on the other hand, although by its agreement to the above-quoted stipulation concedes that the acetate and polyester fabrics which went into the production of defendant's exhibits A and B in their basic crude forms and not further processed are plastic materials, nevertheless contends that the articles in issue composed of textile materials made from man-made fibers are not curtains and panels of "plastics" within the statutory provision.

In support of its position, the defendant presented the testimony of the following four witnesses:

James F. O'Hara, secretary-treasurer and counsel to the Man-Made Fibers Producers Association, Inc. of New York City, a domestic trade association representing approximately 90 percent of the United States production of man-made fibers. Mr. O'Hara identified certain samples of defendant's exhibits A and B which were sent to the Textile Fibers Department of the E. I. duPont de-Nemours & Co., Inc., at Wilmington, Delaware, for analysis.

James N. Alexander, chemist in charge of the test development group at the Textile Research Laboratory of the du-Pont company at Wilmington, who testified as to various chemical and photomicrographic analyses and tests made of the two fabric samples, a summary of the information obtained being set forth in a report received in evidence as defendant's exhibit J.

Dr. James O. Corner, who identified himself as research director of the Dacron Research Division, Textile Fibers Department of duPont for the past two and one half years. He stated that prior thereto during the course of twenty-five years employment with the duPont company he served in various capacities as research chemist and laboratory manager and supervisor. He holds a B.A. degree from Dartmouth College, his major being general chemistry, an M.A. degree from the University of Illinois, and a Ph.D. degree in organic chemistry from the same University. There were received in evidence as defendant's collective exhibit K-1 and K-2 samples of different thicknesses of polyester sheeting material or film made by duPont and sold under the trade name "Mylar Polyester Film".

Dr. Corner testified in detail as to the manner of production of the polyester fabric comprising exhibit B from the basic polymer to its final form, and also the manner of production of polyester sheeting or film represented by exhibits K–1 and K–2.

Rolland G. Frakes, marketing manager of the Films Division of the Plastics Division of the Celanese Corporation, a chemical and textile fiber producer, explained that his company produces cellulose acetate in the form of basic polymer plastic films and sheeting, plastic molding powders and as fibers. He testified to his familiarities with the production of cellulose acetate textile materials and celanese acetate sheeting (defendant's exhibits M–1 and M–2) and films (defendant's exhibit L).

The testimony of Witness Frakes brought out the difference in methods of manufacturing and the physical differences between celanese acetate as a textile material and as a sheet or film, which in both respects were similar to the differences in methods of manufacture and physical characteristics testified to by Dr. Corner in relation to polyester textiles as opposed to polyester sheets and films produced from basic polymers.

Since the parties are in agreement that the imported merchandise in its first estate is composed of "plastics" or "synthetic plastics" material, the question for determination is in essence one of law, to wit, what is the meaning to be ascribed to the word "plastics" used in the context of the provision of item 772.35 of the tariff schedules for "curtains" and drapes, including "panels and valances, * * * and like furnishings; all the foregoing of rubber or plastics," under which the plaintiff seeks relief.

■ As stated in United States, (Lansen-Naeve Corp. a/c Albert Klingelhofer, Party-In-Interest) v. Simon Saw & Steel Company, 51 CCPA 33, C.A.D. 834, it is well established that the basic rule of interpretation applicable to any case involving construction of a statute is that the intention of the Congress is to be given effect. For a resolution of the problem presently before the court, we take recourse to the means at our disposal to divine the intention and scope of the provision in issue.

■ From a consideration of the provisions in contest, it would appear in general that, in line with the intention to particularize the classification of importations, which is deemed to be the purpose of the Tariff Schedules of the United States, woven fabric articles which are produced from yarns made from a plastic substance are covered by the textile fibers and textile products provisions of schedule 3, whereas articles produced from plastics in the form of sheets and film are covered by the provisions of part 12 of schedule 7 for rubber and plastics products. That this was the result contemplated in the enactment of the tariff schedules is evidenced in the following statements taken from the Explanatory Notes contained in the Tariff Classification Study, Schedule 7, Part 12, at page 435—

The basic, statutory provisions under which plastics and rubber articles are classified for tariff purposes remained virtually unchanged since their enactment in 1930. Yet, these provisions became obsolete, confused, and of uncertain application within a few short years after their enactment. The preparation of new tariff provisions for plastics and rubber products involved the resolution of a number of basic problems relating to—

(1) the establishment of clear and meaningful distinctions between—

(a) the basic plastics and rubber materials to be provided for in the proposed chemical schedule and the articles produced from these materials to be provided for elsewhere and

(b) the man-made fibers and products thereof to be provided for in the proposed textile provisions

and the other articles of rubber or plastics; and

(2) establishment of rate descriptions for specific classes of goods and the assignment thereto of rates of duty which are substantially equivalent to those presently applicable.

In view of the manifest inadequacies of the existing provisions and the confusion and uncertainties involved in the classification of plastics products thereunder, these problems were of considerable magnitude.

Due to the rapid growth of the plastics industry over the past several decades which could not have been in the mind of Congress when the basic Tariff Act of 1930 was promulgated and for lack of specific tariff provisions for the growing number of products containing plastics in one form or another, classification under the 1930 Tariff Act was resolved more and more by resort to the similitude provision in paragraph 1559. As stated at page 442 of the above referred to Explanatory Notes—

Accurate statistical data are not available which would reflect the frequency with which the similitude provision in paragraph 1559 is used nor the volume of imports of plastics products classified under that provision. A general idea of the all too frequent use of this provision is shown by classification rulings circularized by the Bureau of Customs in 1957. By actual count, there were over 2200 such rulings circularized. Of these, approximately 350 dealt with the subject of plastic products in one way or another. The vast majority, probably over two-thirds of those dealing with plastics products, mentioned the similitude provision. Impressive as this count may seem, it still does not indicate a full or true picture with respect to the use of the similitude provision for plastics products. Many of the 350 rulings referred to above covered the classification of a number of different plastic products. The indicated classifications of plastics products directly in existing provisions, without resort to the similitude provision were all too few. A sizeable portion of the rulings mentioned the possible applicability of paragraph 1539(b), the provision containing the synthetic-resin-binder principle. Invariably, after mentioning the possible application of paragraph 1539(b), the ruling went on to state, alternatively, the rate which would apply by virtue of the similitude provision.

\* \* \* \* \* \*

It is manifest that, as stated in the Commission's Interim Report[1], the similitude provision has indeed been "overworked" in connection with the classification of plastics and synthetic rubber products. It is equally manifest that rate changes are inevitable if order and classification certainty are to be substituted for the disorder and uncertainty that exists with respect to the tariff treatment of those products under the similitude provision of paragraph 1559. With a view to preserving to the greatest extent practicable rates of duty being assessed on significant classes of imports under established classification practices, detailed analyses have been made of numerous import documents and classification rulings during the past four years. The rates reflected in the proposed schedules for the various classes of rubber and plastics products were arrived at as a result of this research.

As to the miscellaneous rubber and plastics products covered by subpart C of schedule 7, part 12, the following matter quoted from page 451 of the Explanatory Notes is illuminating—

Subpart C covers a number of classes of miscellaneous products of rubber and plastics. As mentioned in the

---

1. March 15, 1955, page 47. [Footnote quoted.]

general explanatory notes to this subpart, preparation of tariff provisions for plastics and rubber products involved the resolution of a number of basic problems. The basic problems in this subpart relate to the establishment of rate descriptions for specific classes of goods and the assignment thereto of rates of duty which are substantially the equivalent of those presently applicable. Some of the superior headings in this subpart are designed to parallel comparable headings in schedules of provisions based on other component materials. Other tariff descriptions in this subpart are the result of the extended analyses of imports made which show them to be significant in import trade.

\* \* \* \* \* \*

Item 772.30 covers certain wearing apparel including rainwear not specially provided for, of rubber or plastics materials. The principal articles included in this category are rainwear of unsupported plastics material. (Rainwear of plastics or rubber-coated fabrics are specially provided for in part 6D of schedule 3.) [\*] The most important article in import trade which would be included in this category at present consists of raincoats made of unsupported vinyl plastics which are currently dutiable by similitude to raincoats of rubber in paragraph 1537(b).

With specific reference to item 772.35 of the tariff schedules relating to furnishings of rubber or plastics, which is the provision invoked by plaintiff herein, we quote the following from the Summaries of Trade and Tariff Informa-

tion, Schedule 7, Volume 7, Rubber and Plastics Products, TC Publication 256:

*Description and uses*

This summary relates to curtains and drapes (including panels and valances), napkins, table covers, mats, scarves, runners, doilies, centerpieces, antimacassars, furniture slipcovers, plastics—hereinafter referred to as and similar furnishings, of rubber or "furnishings".

Furnishings of plastics are by far the most important of the articles considered in this summary; furnishings of rubber are relatively unimportant. *Most of the articles of plastics are made from plastics film or sheeting and their manufacture generally consists of rather simple processing. Cutting to size and hemming, or assembling by heat sealing, are often the principal operations required to produce such articles.* [Italics supplied].

The evidence of record in this case is clear and convincing that the embroidered curtains and the hand-painted panels in controversy are textile products manufactured by weaving cellulose acetate and polyester yarns, respectively, into fabrics and are not the curtains and panels of plastics made from plastic film or sheeting which are provided for in item 772.35.

■ Plaintiff in its brief makes reference to the fact that item 772.35 is an *eo nomine* provision for curtains and drapes, including panels of rubber or plastics, whereas items 365.85 and 367.60 are subject to the schedule 3, part 5, subpart C, headnote 1 provision for "furnishings \* \* \* not specially provided for". Whereas it is well es-

[\*] Part 6 subpart D of schedule 3 provides in part as follows:
Rainwear of textile materials and rubber or plastics:
376.50 Garments with a textile-fabric base supporting a rubber or plastics coating or covering on the outer surface of the garment .......................................... 12.5% ad val.
Garments with a textile-fabric outer surface having a rubber or plastics coating or covering on the inner but not on the outer surface of such fabric:
376.54 With textile fabric of cotton ......................... 15% ad val.
376.58 Other ........................................... 30% ad val.

tablished that an *eo nomine* provision for merchandise will prevail over a provision containing a "not specially provided for" clause, and is in fact required by General Headnote 10(c) (i) (ii) of the tariff schedules, such a limiting clause can produce such an effect only where the two provisions are otherwise clearly applicable—which is not the case here. United States v. Alltransport, Inc., 44 CCPA 149, C.A.D. 653; United States v. Snow's United States Sample Express Co., 6 Ct.Cust.Appls. 120, T.D. 35388.

◼ We are not unmindful of the plausibility of plaintiff's argument to the effect that a tariff provision for an article of a substance adverts to the primary substance of which that article is composed, and absent any further considerations a provision for curtains of plastic might well embrace curtains "woven from an acetate yarn which was spun from man-made fibers of cellulose acetate." Nevertheless in view of the foregoing indicia of congressional intent, the arrangement of the tariff schedules, an apparently clear-cut distinction between textile materials and plastic materials, the close association of rubber and plastics in Part 12 of schedule 7, the historical treatment of man-made fibers and products made therefrom, and the common understanding of the word "plastic",[1] we are loath to assume, without more convincing indications to the contrary, that Congress intended to embrace furnishings of textile materials within a provision for curtains of plastic. We are inclined to the view that the term "plastic" as employed in Part 12 of schedule 7 describes a form as well as a substance, and does not cover plastic materials which have been converted into textile materials.

◼ A yarn which was produced from a basic plastic substance has by that process of manufacture taken on the status of a textile material from which a textile product will be produced, and for tariff purposes may no longer be considered a "plastic" but rather a man-made fiber. (Cf. Tide Water Oil Company v. United States, 171 U.S. 210, 18 S.Ct. 837, 43 L.Ed. 139, and L. Mendelson Co. v. United States, 9 Cust. Ct. 256, C.D. 704.) Textile fibers (of which man-made fibers are one form) and products made therefrom are provided for in schedule 3 of the Tariff Schedules of the United States, and "furnishings" made of such textile materials are especially provided for in items 365.85 and 367.60, which classification has been applied by the customs authorities to the present importations.

By contrast subpart A of part 5 of schedule 3, headnote 3, in referring to "rubber, plastics, or other nontextile materials", expresses plainly what we perceive to be the Congressional intention to distinguish between man-made fibers and fabrics having a plastic base from non-textile plastics materials. And schedule 7 itself provides separately for example for both headwear of man-made fibers, and headwear of rubber or plastics. Cf. items 703.05–703.15 with items 703.70–703.72.

---

1. Websters New International Dictionary, Second Edition (1957), Unabridged: plastic n. A substance that is plastic; specif., any of a large group of organic materials, synthetic or not, that are molded or cast (with or without fillers), and used variously, as for making small articles, cabinets, airplane bodies, or as a substitute for glass. Some are cellulose derivatives, some proteins, and many are resins formed by chemical condensation or polymerization. Rubber and similar materials (as neoprene) are sometimes included among plastics. Plastics are commonly known by their trademark names, for example Celluloid and Bakelite.

Funk & Wagnalls New Standard Dictionary of the English Language (1952): plastic n. * * * One of a group of materials which are capable of being molded at some stage during processing upon the application of the necessary heat and pressure; especially any organic material, synthetic or natural, derived by chemical condensation or polymerization from cellulose, proteins, resins, and sometimes rubber, suitable for molding into commercial articles.

Due consideration has been given to the cases cited in the excellently prepared briefs filed by the parties hereto, and the court wishes to express its appreciation for the painstaking efforts of counsel.

Upon the record before the court and for the foregoing reasons, the claim of plaintiff for classification of the question merchandise in item 772.35 of the Tariff Schedules of the United States is overruled. All other claims, having been abandoned, are dismissed.

Judgment will be entered accordingly.