COMPETITIVE EDGE, PLAINTIFF v. UNITED STATES, DEFENDANT

Court No. 85–07–00981

(Decided November 9, 1988)

*Grunfeld, Desiderio, Lebowitz & Silverman (Steven P. Florsheim)* for plaintiff.

*John R. Bolton,* Assistant Attorney General, *Joseph I. Liebman,* Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Michael T. Ambrosino*) for defendant.

DICARLO, *Judge:* This action concerns the proper tariff classification of athletic shoes from Taiwan invoiced as "Men's PVC Suede Sponge Leather Sport Shoes." The United States Customs Service (Customs) classified the shoes under item 700.61 of the Tariff Schedules of the United States (TSUS), as "[o]ther: [f]ootwear having soles * * * of rubber or plasics * * * affixed to the upper exclusively with an adhesive * * * [v]alued not over $6.50 per pair."

The Competitive Edge (importer) contends the shoes are properly classifiable under item 700.56, TSUS, as "[o]ther footwear * * * [h]aving uppers of which over 90 percent of the exterior surface area is rubber or plastics * * *."

The Court has jurisdiction under 28 U.S.C. § 1581(a) (1982). The Court holds that the footwear is not properly classifiable under item 700.56, TSUS, and affirms Custom's classification of the footwear under item 700.61, TSUS.

BACKGROUND

Marketed under the brand name "Jox," the imported athletic shoes come in two color combinations of grey with maroon trim and navy with white trim. The uppers of the shoes contain no rubber but consist of two types of materials. The first material is the plastic trim which comprises less than ten percent of the exterior surface area of the upper.

The second material of the upper is blue or grey depending upon the color combination of the shoe. This material comprises the remainder of the shoe upper and has four layers. The bottom layer is a woven fabric. The next layer is a hardened plastic foam. The third layer consists of a blown-on nylon flocking which has a velvet-like texture and appearance. The fourth and last substance is a plastic applied to the nylon flocking. After bonding of these layers, the upper surface is lightly buffed.

This upper surface area is the focus of this controversy. Application of the top plastic layer and buffing removes some of the plastic on the surface of the material. These processes alter the material's surface appearance and texture from velvet-like to suede-like.

Under a microscope, some of the nylon flocking fibers are visible above the surface of the shoe. Some of the visible fibers are coated with the plastic and some are not.

The following are the relevant sections of TSUS:

Schedule 7, Part 1, Subpart A, Headnotes:

> 3. For the purposes of items 700.51 through 700.56, the rubber or plastics forming the exterior surface area specified, if supported by fabric or other material, must coat or fill the supporting material with a quantity of rubber or plastics sufficient to visibly and significantly affect the surface otherwise than by change in color, whether or not the color has been changed thereby.

\* \* \* \* \* \* \*

> Footwear (whether or not described elsewhere in this subpart) which is over 50 percent by weight of rubber or plastics or over 50 percent by weight of fibers and rubber or plastics with at least 10 percent by weight being rubber or plastics:

\* \* \* \* \* \* \*

> > Other footwear \* \* \*:

> > > having uppers of which over 90 percent of the exterior surface area is rubber or plastics \* \* \*

Item 700.56 Other ..............................6% *ad val.*

\* \* \* \* \* \* \*

> Footwear (whether or not described elsewhere in this subpart) which is over 50 percent by weight of rubber or plastics or over 50 percent by weight of fibers and rubber or plastics with at least 10 percent by weight being rubber or plastics:

> > Other:

> > > Footwear having soles \* \* \* of rubber or plastics which are affixed to the upper exclusively with an adhesive \* \* \*:

Item 700.61 Valued not over $6.50 per pair ..... 37.5 *ad val.*

## ISSUES

1. Whether the outer plastic layer on the uppers of the shoes forms the exterior surface area of the suede-like material.

2. Whether the shoes have uppers of which over 90 percent of the exterior surface area is plastic.

## DISCUSSION

A classification by Customs of imported merchandise is presumed to be correct and the importer has the burden of proving that Customs' classification is incorrect. 28 U.S.C. § 2639(a)(1) (1982). The

importer need not establish that its proposed classification is correct. *Jarvis Clark Co.* v. *United States,* 2 Fed. Cir. (T) 70, 75, 733 F.2d 873, 878 (1984). Rather, it is the court's duty to ascertain the correct classification, both independently and in comparison with the importer's alternative. *Id.*

In order to be classifiable under item 700.56, TSUS, as the importer contends, imported footwear must satisfy two requirements. First, the shoe must meet the general requirement of Schedule 7, Part 1, Subpart A, Headnote 3, TSUS (Headnote 3). Headnote 3 provides that if the "plastics forming the exterior surface area" of the shoe upper is supported by fabric or other material, the plastic must also "coat or fill the supporting material with a quantity of * * * plastics sufficient to visibly and significantly affect the surface otherwise than by a change in color * * *." The second requirement is that the exterior surface area of the shoe upper be more than 90 percent plastic. Item 700.56, TSUS.

As to the requirement in Headnote 3, neither party asserts that the outermost plastic layer on the shoe uppers does or does not fill the supporting flocking. Moreover, the parties agree that the plastic visibly affects the surface area by changing the texture and appearance of the material from velvet-like to suede-like. Nevertheless, Customs does not agree that the plastic forms the exterior surface nor that the exterior surface is over 90 percent plastic. Customs argues that the application, bonding, and buffing of the plastic settles it toward the bottom of the flocking fiber so that most of the fiber strands are not encapsulated by the plastic but rather stand free and uncovered at the surface above the layer of plastic.

Both parties conducted independent laboratory analyses of the material on the uppers of the shoes to determine the extent to which the exterior surface area of the material is plastic. Both tests involved cutting small swatches of the material and dyeing it with an identification stain so to distinguish the nylon flocking from the plastic on the surface. Both tests then subjected the material to microscopic examination at varying magnifications. The Court admitted into evidence photographs and heard testimony of expert witnesses on the respective observations and conclusions from the two tests.

Both parties concluded that at the upper-most portions of the material, a substantial number of nylon strands protruded above the plastic layer. The parties disagreed to what extent these freestanding fibers were coated with plastic. The importer's expert witness, a chemist and chemical engineer, testified that all fibers below 50–60 percent of the height of the nylon flock are completely covered in plastic. R. 34. Only 20 percent of all the flocking fibers he observed protrude above the surface, R. 60, and of those that do protrude, over 90 percent are coated with plastic. R. 48. The importer's witness concluded, therefore, that the suede-like material is almost en-

tirely plastic. Accordingly, the importer argues that the shoe uppers are over 90 percent plastic.

Customs offered testimony from the Chief of the Fibers Branch of the Customs Laboratory in New York. The witness testified that Customs' laboratory analysis on ¼ to ⅓ of the shoe revealed that the flocking on the exterior surface of the shoe is fibrous and remains uncoated and unencapsulated with plastic. According to the witness' observations, application of the plastic and the buffing process on the flocking leave 95 percent of the fibers freestanding above the surface and uncoated by plastic. R. 141. Only five percent or less of the freestanding fibers were covered with plastic. R. 108. In addition, the small percentage of plastic encapsulated fibers are unchanged in that they do not bond together or form into clusters. Customs asserts, therefore, that the vast majority of the flocking fibers are not plastic coated and that the exterior surface of the upper cannot be more than 90% plastic.

The focus of the requirements in Headnote 3 and item 700.56, TSUS, is the composition of the exterior surface area of the material on the upper. Based upon the testimony of the expert witnesses and an examination of the evidence, the Court finds that the plastic layer does not form the exterior surface of the material on the upper. Read *in pari materia* with item 700.56, TSUS, where the surface is coated or filled with plastics per Headnote 3, the plastics must form the exterior surface. *See Inter-Pacific Corp.* v. *United States*, 8 CIT 132, 139 n.3, 594 F. Supp. 743–44 n.3 (1984). *Webster's Third New International Dictionary* (1986) defines the term "exterior" as "situated at and forming the outer surface or limit." *Funk and Wagnalls New Standard Dictionary of the English Language* (1942) defines "exterior" as "[f]orming the outer side (of) constituting or connected with the external part"; "[i]mmediately and outwardly manifest; noted by the senses; visible." Using these definitions, the court in *Inter-Pacific Corp.* held that the common meaning of the term "exterior surface area" is "a sensory perception manifest as being the *outermost covering* of a particular object without regard to the functionality of the coverage." 8 CIT at 139 (emphasis added). By this definition, the evidence shows that the plastic lies at a lower level than the outermost portion of the material defined by the protruding fibers. Thus, the protruding fibers rather than the plastic form the exterior surface of the material.

The Court also holds that the nylon flocking forming the exterior surface area of the material is not itself plastic within the meaning of Headnote 3 or item 700.56, TSUS. While in a broad sense the nylon flocking is made of plastics, the nylon strands of the flocking are more specifically described in TSUS as man-made fibers. "Articles of plastic are not always, and perhaps not usually, in the form of * * * fabrics. Schedule 7 itself makes separate provision in a number of instances for articles of man-made fibers or textile materials and the same articles of plastics." *F.B. Vandegrift & Co.*

v. *United States,* 63 Cust. Ct. 12, 17, C.D. 3866, *aff'd,* 56 CCPA 105, C.A.D. 962, 410 F.2d 1259 (1969). *See also R.H. Macy & Co.* v. United States, 62 Cust. Ct. 219, C.D. 3733, 297 F. Supp. 171 (1969), *aff'd,* 57 CCPA 115, C.A.D. 988, 428 F.2d 856 (1970) (as employed in Schedule 7, Part 12, TSUS, the term plastic does not cover plastic materials converted into textile materials). As the flocking is composed of nylon strands, a synthetic, man-made filament, *see Webster's Third New International Dictionary* 1553, 2321 (1981) (defining "nylon" and "synthetic"), it will be considered fiber and not plastic for the purposes of tariff classification under Schedule 7, Part 1, TSUS.

As the protruding nylon fibers comprise the exterior surface area of the material and are not themselves plastic, it is necessary to calculate the amount of plastic on the individual nylon strands in order to determine whether the material meets the requirements of item 700.56, TSUS. Based on the evidence presented, the Court concludes that the uppers of the shoes are less than 90 percent plastic. Although the importer asserted that over 90 percent of all the fibers counted were coated with plastic, there was little indication from the evidence that a majority of the fibers are plastic covered. Nothing in the photographs of the material indicates that those fibers that do have plastic on them have any more than a few clumps on the strand and few fibers in the photographs have a plastic meniscus or web at their base which would indicate a plastic covering. Moreover, most of the strands that the importer claims to be covered by a thin film of plastic remain dyed the same color as uncoated strands. The only evidence that there may have been plastic on many of these strands is a certain rougher appearance than would be expected with smooth strands of nylon filament. The Court is unconvinced that this roughness is not attributable to other factors such as abrasions from the buffing, melts from heat or friction, or contaminants unconnected to the manufacturing process.

Although estimations are concededly imprecise, the Court is satisfied that Customs' calculations of the amount of plastic on the nylon strands were more thorough. Unlike the importer's analysis, Customs considered the varying lengths of the individual fibers and calculated the proportion of plastic to nylon by viewing the surface area of the strands as three dimensional rather than by merely counting the exposed fibers. Customs also considered that uncoated fibers might be longer than coated fibers because buffing would take more plastic off the longer fiber strands.

Customs' witness estimated that at best the upper surface was 75 percent plastic and his lowest estimate was 45 percent. R. 98, 100. Even assuming the more generous figure is correct, when one includes the 10 percent coverage of the plastic trim, the exterior surface area of the shoe uppers is still less than 90 percent plastic.

While some of the fibers that stand free may have some quantity of plastic on them, the Court finds that the shoes have an insufficient amount of plastic on the uppers to be considered over 90 percent plastic. Accordingly, the Court holds that the footwear is not classifiable under item 700.56, TSUS.

### CONCLUSION

Based upon the evidence presented, the Court finds the imported athletic shoes are not classifiable under item 700.56, TSUS, because the exterior surface area of the upper is not over 90 percent plastic. The Court affirms Custom's classification of the shoes under item 700.61, TSUS.