56 CCPA

**F. L. SMIDTH & COMPANY, Appellant,**

**v.**

**The UNITED STATES, Appellee.**

**Customs Appeal No. 5302.**

United States Court of Customs and Patent Appeals.

May 1, 1969.

---

7. Findings 25, 26 and 27, *infra.*

Barnes, Richardson & Colburn, New York City, attorneys of record, for appellant. J. Bradley Colburn and Joseph Schwartz, New York City, of counsel.

William D. Ruckelshaus, Asst. Atty. Gen., Andrew P. Vance, Chief, Customs Section, Glenn E. Harris, New York City, for the United States.

Before RICH, Acting Chief Judge, NICHOLS and NEESE, Judges, sitting by designation, and ALMOND and BALDWIN, Judges.

NICHOLS, Judge.

We have before us a petition for review. Appellant; plaintiff below, is dissatisfied with a decision by the Customs Court, Second Division, 59 Cust.Ct. 276, C.D. 3141, holding that an importation of certain "steel tires," which are parts of rotary kilns used in production of cement, were properly classified by customs officials under item 661.30, Tariff Schedules of the United States (TSUS) which provides as follows:

> Industrial and laboratory furnaces and ovens, non-electric, and parts thereof ............... 19% ad val.

Appellant limits its case to the claim that the imported articles were properly dutiable at 12.5% ad val., under item 661.70 which provides as follows:

> Industrial machinery, plant, and similar laboratory equipment, whether or not electrically heated, for the treatment of materials by a process involving a change of temperature, such as heating, cooking, roasting, distilling, rectifying, sterilizing, pasteurizing, steaming, drying, evaporating, vaporizing, condensing, or cooling; instantaneous or storage water heaters, non-electrical; all the foregoing (except agricultural implements, sugar machinery, and machinery or equipment for the heat-treatment of textile

yarns, fabrics, or made-up textile articles) and parts thereof:

\* \* \* \* \* \*

Other .............. 12.5% ad val.

The court below summarized the record before it in words we find accurate and adopt as our own:

The record herein consists of the testimony of one witness called on behalf of plaintiff and six exhibits received on behalf of plaintiff. Plaintiff's exhibit 1 consists of a sketch of a typical rotary kiln while exhibits 2, 3, 4, and 5 are actual photographs of the rotary kiln upon which the tires in question were installed. Plaintiff's exhibit 6 is a brochure containing pictures and describing a typical rotary kiln.

Basically, the testimony adduced at the trial was to the effect that the imported steel tires are parts of a rotary kiln and were actually installed at the plant of Southwestern Portland Cement in Victorville, California. The steel tires involved weigh over 100,000 pounds each and the kiln without the imported steel tires weighs over 2,000,000 pounds. The kiln itself is used for the production of cement. The steel tires form part of the kiln and are necessary in order for the kiln to rotate. The kiln itself, while not involved herein, is described to be gasfired. The rotation of the kiln is accomplished by means of a motor—in this instance a 700 horsepower electric motor—which provides its power to a gear rim and drive which consists of two speed reducers and two electric motors. The steel tires involved herein rest upon rollers to permit the rotation of the kiln. They are necessary because of the heavy weight of the kiln. The witness further explained that without the tires, the rotary kiln would collapse.

The evidence also indicates that, in addition to the driving motor, there are other electric motors used for fans for combustion and for blowing cool air through the "hot clinker" and that the cooler itself has a drive for moving the clinker through the cooler. The evidence also establishes that, in addition to the driving motor, an emergency gasoline engine is placed with the unit but used only in the event of an emergency to permit the kiln to rotate temporarily since an interruption during production would cause the kiln to become "crooked."

The witness also testified that the rotary kiln does not have any crucibles, retorts, fire beds, or shelves and that, in the operation, a chemical change of the materials fed into the kiln is caused by the heating, that there is a change of temperature in the kiln, and that said kiln accomplishes cooking, roasting, drying, and evaporating. In further explanation of this, the witness stated that cooking is drying out the $CO_2$, roasting is diffusing into the clinker the calcined material, and that drying is preheating of the material and the evaporation of moisture.

On cross examination, a number of questions were directed to the witness relative to the question of substitution of other forms of power for the electric motors. The sum and substance of this testimony was to the effect that the substitution could be readily accomplished but would not be practical because it would require too large a gasoline engine. The balance of the testimony relates to the terminology and understanding of the terms furnace, oven, and kiln.

We add that the entry was made in 1965 and counsel on both sides stated in oral argument that they were not aware of importations of the type of the involved merchandise at any earlier date, nor did their researches, which we have no doubt were diligent, disclose any decisions, rulings, or practice with respect thereto. We understand this to include any articles, other than the "tires" which might be incorporated as parts of the kilns described in the record. A brochure of appellant's exhibit 6, indicates that the kilns come in varied sizes up to 460 feet in length. There is nothing

in the record to show whether the "tires" are standard commercial items or are specially produced on a tailored basis.

■ The court below first took up the application of item 661.30. It held that as to the rotary kilns before it, the item was ambiguous. This was not because of any doubt that the terms "furnaces and ovens" cover these kilns. The court disregarded testimony that the kilns were never referred to as ovens or furnaces, stating, correctly we believe, that its function was to determine the common meaning of the terms furnace and oven based on its own understanding of those terms. It resorted to dictionaries and encyclopedias, both general and technical, and derived from them what we regard as overwhelming support for the proposition that "ovens" and "furnaces" do include kilns of the kind involved, as well as other kinds. It is needless to review further this part of the opinion below, as appellant does not attack it here and it raises no difficulty. United States, etc. v. Simon Saw & Steel Co., 51 CCPA 33, C.A.D. 834.

The ambiguity rather was derived from the words "non-electric" in item 661.30, in light of the fact that the kiln, though gasfired, uses electric motors, as stated above, to rotate the kiln and to move air into and out of the burning charge. The court said that grammar and prior experience under the superseded Tariff Schedules would indicate that the involved merchandise cannot be called non-electric, but it invoked extrinsic aids to show that, within the intent of Congress, it is non-electric in spite of appearances.

■■ We agree with the result. We believe, however, that in common speech no one would call a gasfired oven or furnace electric because it made use of electric power for auxiliary purposes. The difficulty would occur only to a mind imbued with conceptions valid under the former law, which employed, however, entirely different phraseology, as explained below. We hold that the former schedules have a proper use in inter-

preting the current ones only to resolve ambiguities, not to raise them. C. S. Emery & Co., et al v. United States, 57 Cust.Ct. 217, C.D. 2767. We find the language of item 661.30 unambiguous in its coverage of the instant merchandise.

Here, the situation parallels *Emery*, so far as the Tariff Commission apparently has placed a commodity in item 661.30 under a less favorable rate than it enjoyed under the former schedules, while alleging in explanatory notes submitted to Congress in connection with its draft of the new schedules that it made no rate changes in item 661.30. Plaintiff and the court below believe, and we accept *arguendo*, that under former law the involved kilns would have been dutiable at a lower rate than 19%, either under paragraph 353 or 372. Paragraph 353 covered "articles having as an essential feature an electrical element or device" and under this language it is indeed possible that an electrical element, though auxiliary, may be "essential." It is this memory, of course, very much alive in the minds of all persons experienced in tariff classification under the old schedules, that makes it hard for them to view afresh and *de novo* the language of item 661.30. However, we note that neither plaintiff nor the court below is sure these kilns would not have fallen under 372 instead of 353. Moreover, there is not here, as in *Emery*, evidence of an actual, instead of merely hypothetical, more favorable former practice. The Tariff Commission note further said that merchandise under item 661.30 would be classified in par. 397 under the previous law.

Appellant sees in the facts herein evidence that the Tariff Commission could not have intended item 661.30 to apply to the involved kilns. The court below sees it rather as a mere breach by the Tariff Commission of its statutory obligation under Public Law 768, 68 Stat. 1136, not to lay before Congress rate changes in the new Tariff Schedules except upon notice to interested parties and an opportunity to be heard, though the plaintiff could not avail itself of this

irregularity because the Congress enacted the new schedules anyway. We do not think the inferences of either the appellant or the court below are fully justified. To show why, we must consider the purpose of the Congress in directing that the Tariff Classification Study be made.

The Tariff Classification Study, Submitting Report, November 15, 1960, reflects the following (and is the authority, with its Appendix A, for fact statements herein not otherwise attributed): with the revival of world trade after the hiatus of World War II, there began to be heard a crescendo of complaints about the United States Customs Laws. They were alleged to be full of traps for the unwary. Foreign exporters to the United States could not ascertain what treatment their exports would receive here, the negotiation of trade agreements was hampered; accurate trade statistics were impossible; customs officers and custom house brokers were perplexed. The tariff laws were

> * * * in large measure a mystery to the uninitiated and full of constant surprises even for persons who have devoted their lives to the subject. (Submitting Report, *supra*, p. 6.)

The antiquated and fantastically jumbled Tariff Schedules got a large part of the blame. A management survey of Customs by McKinsey & Co., in 1949, was financed by Congressional appropriation and considered by Congress. It was concerned in part with management problems caused by "tariff classification complexities." The Treasury Department made numerous proposals. The ECA Commerce Mission, and other bodies concerned with foreign economic policy, urged simplification. The Randall Commission on that subject seems to have first urged that the Tariff Commission be given the job of classification simplification.

The responses of Congress are embodied in the Customs Simplification Acts (as Congress itself called them) of 1953, 1954 and 1956. P.L. 243, 83d Cong., 1st Sess., U.S.Code Cong. & Admin.News, p. 2283; P.L. 768, 83d Cong., 2d Sess.; P.L. 927, 84th Cong., 2d Sess., U.S.Code Cong. & Admin.News, p. 4213. The word "Simplification" was not selected at random or out of mere whim, and reflects not only the background but also the thrust and purpose of the majority of sections in all three enactments. For example, Section 4 of the 1953 Act eliminates a mass of inconsistent and arbitrary provisions respecting marking to show country of origin, leaving a single uniform provision in effect for all merchandise not expressly exempted. Section 18 repeals an old provision the younger generation must find it hard to believe ever existed, by which automatic penalty duties were assessed in any case of undervaluation in a customs entry, however innocent, leaving the importer who had honestly believed his merchandise was worth less than the ultimate customs appraisal with no relief or remission except by petition to the Customs Court. The 1956 law enacts a long-sought simplification of customs appraisement. Title I of the 1954 Act directs the Tariff Commission to study tariff classification and recommend new laws which will respond to the changes in trade since the 1930 Act, eliminate anomalies, and "Simplify the determination and application of tariff classification." The Commission was to avoid suggesting rate changes so far as possible and when it felt it must do so, to employ certain procedures including notice and hearing. Sec. 101(b).

This directive led to the submission of the Tariff Classification Study by the Commission to the Congress in 1960 and its enactment into law, P.L. 87–456, 76 Stat. 72. The purpose of simplification is stressed in the study itself. There can be no doubt, therefore, that a leading objective of the new schedules was simplification, and they ought to be construed to effectuate that object. On the other hand, there was a conscious purpose to supersede the old schedules, which were recognized as marvels of complication and obscurity.

The Commission particularly sought to consign old paragraphs 353 and 372 to oblivion, as they were notorious litigation-breeders. The appellant's interpretation technique herein would restore them to a sort of ghostly life. No one could correctly interpret a broad band of items in the new schedules without comparing them and their explanatory notes with old paragraphs 353 and 372 and observing whether the juxtaposition raised an ambiguity. This is not customs simplification. It is customs complication.

It will have been noted that there is no evidence that the type of merchandise in the instant case, or any other parts of cement kilns, were imported under the old law, or that there were any decisions, rulings, or practice concerning them. The Tariff Commission in 1955 gave notice that with respect to such merchandise, not actually known to be imported, it could not guarantee not to change rates in new schedules without notice and hearing, nor could its assurance that any new item did not embody a rate change always be relied on. It did this in the following language in the "Interim Report" submitted to the Congress, March 15, 1955, per direction in Sec. 101(d) of the Customs Simplification Act of 1954, and again as Appendix A to the 1960 "Submitting Report" of the Tariff Classification Study. At p. 56 it said:

> With respect to the requirement in section 101(b) of Public Law 768 that in the case of incidental rate changes "the Commission shall specify each incidental change in rate * * * and shall accompany it with a summary of all the data on which such suggested change was based" it should be understood that where changes in terminology are undertaken, every possible change in rate that might result cannot always be foreseen. Moreover, there are uncertainties as to the tariff status of some articles under the existing law. Accordingly, the Commission will be obliged to interpret the instructions in section 101(b) as requir-

ing it to specify each incidental change in rate "to the fullest extent practicable."

At p. 7 of the 1960 Report, it is stated that the proposed schedules do not involve "significant rate changes" by which is meant that

> "(1) The change itself is small and would not affect trade, or (2) that the change, even if large in absolute amount, is unimportant because of the unimportance of the article in international trade."

Thus it appears that the Tariff Commission intended that assurances such as were made in the explanatory note to item 661.30, that the items covered therein were covered by paragraph 397 under the old law and that no rate increases were accomplished with respect to them, were not warranted to be true and indeed were not intended to apply with respect to commodities not under the Commission's observation because not imported. Since these statements were before the Congress, its intention in enacting the schedules must have been the same. If the plain language of an item brought about a rate increase for any such product, it was intended and expected to be effective notwithstanding assurances that no rate increase was accomplished. Thus appellant's argument on intent fails to convince. Moreover, there is no basis to accuse the Commission of violating § 101(b), as the court below does, the Commission's interpretation of § 101(b) appearing to be reasonable and the only one practically possible. None of the above necessarily applies to an article known by trade statistics to have been imported under the old law, or known to have been the subject of decisions, administrative rulings, or the settled practice of customs officers. Then the assurance that the rate was not changed might have a different significance, especially if the new item were ambiguous.

Thus we do not agree with appellant's argument that item 661.30 was not intended to cover parts of cement kilns. As the language is unambiguous, we

need not resort to an extrinsic aid as the court below did, to sustain our conclusion. It referred to the explanatory notes to the "Brussels Nomenclature." This "Nomenclature" was put forth by the Customs Cooperation Council, an international organization, for adoption by its member nations, with the idea that their tariff items might be made uniform in phraseology, even if the rates were different, and this phraseology, becoming familiar, would help trade by reducing the uncertainty of exporters as to how their exports would fare with the customs of trading partners.

It would have been possible, perhaps within the statutory mandate, to recommend our nation's adoption of the Brussels Nomenclature, but the Commission elected not to do so. However, it did adopt much of the Brussels phraseology in some of its schedules. The court below has therefore quite frequently referred to the Brussels explanatory notes as legislative history. Instances are cited in appellee's brief, to which may be added the recent case of International Air Freight v. United States, Cust.Ct., C.D. 3731, decided March 4, 1969.

If a person has to send to Brussels for the Nomenclature and explanatory notes thereto before being able to interpret the United States tariff, this might seem to some as customs complication, not simplification. If, however, a tariff item is seen as genuinely ambiguous, as the court below, mistakenly we think, deemed item 661.30 to be, it is difficult to criticize lawyers and judges for seeking light wherever they can find it.

In Rivkin Textile Corp. v. United States, 54 CCPA 138, 141, C.A.D. 925, this court held it was proper to refer to Tariff Commission explanations as legislative history to clarify an item we specifically held *was* ambiguous. At the same time we referred with approval to Sandoz Chemical Works v. United States, 50 CCPA 31, C.A.D. 815, holding that there was no reason to resort to "rules of statutory construction" in case of a non-ambiguous provision. Since we hold the item before us to be unambiguous,

we do not need to consider whether or not the explanatory notes to the Brussels Nomenclature support our position.

The Tariff Commission's own explanatory note to item 661.30 in the Tariff Classification study affords indication that the court below was right, insofar as it states that item 661.30 covers industrial and laboratory furnaces and ovens producing heat *"by the consumption of fuel"* (emphasis supplied) but we note this without indicating reliance, as we think use of even this close-at-hand source of legislative intent is questionable in the absence of ambiguity.

■ We turn now to the item claimed to be applicable, item 661.70. Appellant says that even if the imports are enumerated in 661.30, they are enumerated also in 661.70 which is more specific. The court below never considered this issue because it derived from the explanatory notes to the Brussels Nomenclature what it deemed to be such a clear indication that 661.30 was meant to cover the merchandise that relative specificity was inapposite. We doubt the validity of this solution of the problem. Relative specificity is now made an express part of the legislation. The pertinent parts of General Headnote 10 read as follows:

For the purposes of these schedules

(a) * * * the provisions describing the classes of imported articles and specifying the rates of duty or other import restrictions to be imposed thereon are subject to the rules of interpretation set forth herein and to such other rules of statutory interpretation, not inconsistent therewith, as have been or may be developed under administrative or judicial rulings;

 *     *     *     *     *     *

(c) an imported article which is described in two or more provisions of the schedules is classifiable in the provision which most specifically describes it; but * * * [what follows not applicable].

This appears to us to mean this: if an article is determined to be clearly described in two or more items, selection of the controlling item by relative specificity is mandatory and takes precedence over other judge-evolved methods of resolving ambiguity, including resort to extrinsic aids such as legislative history.

We agree with appellant that item 661.70 does describe the instant merchandise. We do not agree it is more specific. It is not, and item 661.30 is, the item having requirements which are "more difficult to satisfy." Arthur J. Humphreys, et al. v. United States, 56 CCPA, C.A.D. 956 (decided March 6, 1969); United States, etc. v. Simon Saw & Steel Co., *supra*. It is hard to imagine any article covered in 661.30 that is not also covered in 661.70, and furthermore, 661.70 embraces such articles whether or not electrically heated. Besides the heating embraced by 661.30, 661.70 embraces cooling devices. A number of functions are enumerated in 661.70, for which the furnaces and ovens of 661.30 would not be used: distilling, rectifying, sterilizing, etc.

Appellant, if we understand its position, thinks that item 661.70 is more restrictive because articles it covers must be used for the treatment of materials by a process involving a change of temperature, while industrial and laboratory furnaces and ovens can be used for any purpose. However, the definitions quoted by the court below indicate that the uses of the industrial and laboratory furnaces, and ovens of item 661.30 generally are to treat materials by use of heat. If they have other uses, appellant has not shown what they are, either by evidence or matter of which the court could take judicial notice. We are aware, of course, that home owners call furnaces the contrivances in their basements that furnish central heat in winter, but these are dealt with in items other than those at bar. Appellant's position, unsupported as it is, seems to us to invoke sterile semantics rather than common speech.

Appellee says that we should remand the case rather than deciding it if we think relative specificity is controlling, so that the court below can make fact findings. But the issue is not factual. We said in the *Simon Saw* case, *supra*, at p. 40:

The rule of relative specificity is a judicial aid to the construction of a statute in order to conform with the intent of Congress.

It is a question of law. If, at times, factual issues may be incidentally involved, appellee does not state what they might be in this case, except in a hypothetical fashion. The determination of issues of law is a proper function of an appellate court. The court below had placed before it the issue of relative specificity, and declined to pass on it in its opinion only because it thought other considerations were decisive. But there is nothing in the record to show that the hearing judge, or the Division, refused to receive anything the parties tendered on the issue of relative specificity. So far as appears, it was open to appellee to make a record on this issue if it wished to do so. Appellee's desire for a remand is apparently contingent on the possibility we might contemplate a reversal, and as we do not, we suppose it wishes its request not to be considered anyway.

The judgment of the Customs Court is affirmed.

Affirmed.

NEESE, J., concurs in the result.