59 CCPA

**ARTHUR J. FRITZ AND COMPANY, Western Oilfields Supply Company, Appellants,**

v.

**The UNITED STATES, Appellee.**

**Customs Appeal No. 5405.**

United States Court of Customs and Patent Appeals.

Dec. 30, 1971.

---

8. See F. L. Smidth & Co. v. United States, 56 CCPA 77, C.A.D. 958, 409 F.2d 1369 (1969).

Glad & Tuttle, Los Angeles, Cal., attorneys of record, for appellants. Robert Glenn White, Los Angeles, Cal., of counsel.

L. Patrick Gray, III, Asst. Atty. Gen., Andrew P. Vance, Chief, Customs Section, Martin L. Rothstein, New York City, for the United States.

Before WORLEY, Chief Judge, and RICH, ALMOND, BALDWIN and LANE, Judges.

LANE, Judge.

This is an appeal from the decision and judgment of the Customs Court, 63 Cust.Ct. 484, C.D. 3940 (1969), upholding the customs collector's classification of imported sealing rings as gaskets under item 773.25 of the Tariff Schedules of the United States (TSUS) with duty at the rate of 10 per centum ad valorem, and overruling appellants' protest and claim that the proper classification should be under item 666.00 TSUS which provides for free entry of agricultural and horticultural implements not specially provided for, and parts thereof. We affirm.

The statutory provisions at issue here read in pertinent part as follows:

773.25 Gaskets, of rubber or plastics . . . . . . 10% ad val.

666.00 Machinery for soil preparation and cultivation, agricultural drills and planters, fertilizer spreaders, harvesting and threshing machinery, hay or grass mowers (except lawn mowers), farm wagons and carts, and agricultural and horticultural implements not specially provided for, and parts of any of the foregoing . . . Free

Appellants assert error on two grounds. First it is urged that the imported sealing rings are more than gaskets and therefore not properly classified under an item limited to gaskets. It is next contended that in any event, item 773.25 was improperly included in the TSUS and is therefore null and void. We will consider each issue in turn.

## CLASSIFICATION

The imported articles were invoiced as sealing rings and are used in irrigation equipment. A ring is positioned at the junction of a pipe and a coupling, and when water is forced through the junction, the water pressure expands the ring so as to effect a seal which prevents seepage or drainage of water at that point. It is undisputed that in this capacity the sealing rings function as gaskets. When the flow of water and pressure is terminated, the ring relaxes and permits water drainage from the pipes. Irrigation pipes are moved frequently in the field, and the residual water is a load which the testimony at trial indicates is so great that movement of the pipe is virtually impossible. The automatic drainage allowed by the imported sealing rings overcomes this problem. Because the rings allow this drainage to occur, the rings are, appellants urge, more than gaskets.

The Customs Court referred to several dictionary definitions of gasket which read:

Plaited hemp or tallowed rope for packing pistons, making pipe joints, etc.; hence packing for the same purpose made of rubber, asbestos, metal, or other suitable material, usually in the form of sheets or rings.[1]

(1) A thin, flat, annular packing-piece of india-rubber, leather, or sheet metal, placed between two flat surfaces, as a manhole-plate and a boiler-head, to make their joint watertight. (2) A packing of hemp or other fibrous stuff, or of lead, between the bell of one pipe and the spigot or male end of another.[2]

Structurally, the imported articles are, as described by name, rings, and are made of rubber. In structure, and function as well, the merchandise conforms to that commonly understood to be gaskets. The difficulty in distinguishing the rings from gaskets is further apparent from the testimony of the plaintiffs' witness at trial on cross-examination, which was, in pertinent part, as follows:

Q. Mr. Lake, will you further describe how the draining takes place in this operation? A. The gasket is not a tight fit on the pipe or the coupling until it is expanded by the internal pressure [of the water].

Q. In use it is used as a gasket, it seals? A. It seals, yes, sir.

Q. And it ceases being a gasket, if I understand, according to what you are saying, when it's not in use? In other words, when it drains?

* * * * * *

A. How could be cease to be?

Q. It's still a gasket? A. Yes.

Q. It would be a gasket if you carried it around in your hand before you put it on?

---

1. Webster's New International Dictionary of the English Language, second edition (1958).

2. Funk & Wagnalls New "Standard" Dictionary of the English Language (1956).

\* \* \* \* \* \*

A. You pick it up, you can call it a gasket or sealing ring.

Q. Essentially, this is a loose-fitting gasket specially designed for this operation? A. You could call it that, or you could call it packing.

The conclusion of the Customs Court was that in use, the rings functioned as gaskets. Appellants argue that the draining operation is also a use and because it is capable of the dichotomous functions of sealing and draining, the rings more resemble valves than gaskets. We do not think the analogy is well-taken. In the case of the instant rings, they are made loose-fitting to accomplish a merely incidental purpose; their structural design is geared to what we are constrained to hold to be the primary purpose—sealing.

■ Our opinion in United Carr Fastener Corp. v. United States, 54 CCPA 89, C.A.D. 913 (1967), supports the view we take rather than a different result as urged by appellants. We reject here, as we did there, the claim that the imported goods are more than articles provided for *eo nomine* in the Tariff Schedules for the common reason that the principal goal of the design of the goods was to facilitate the function characteristic of the article named, in the Tariff Schedules despite certain advantages of the importations over conventional articles of the type described.

For the above reasons, we hold the sealing rings at issue to be properly classified as gaskets as determined by the customs collector and so held by the Customs Court.

## VALIDITY OF THE TARIFF ITEM

■ The Customs Court found appellants' arguments against the validity of item 773.25 TSUS to be without merit

and held that item to have the same force and effect as any other tariff provision in the Schedules. We agree.

The present Tariff Schedules were a product of a legislative attempt to simplify the complex Tariff Act of 1930 as repeatedly modified.[3] In November 1960, the Tariff Classification Study was submitted to the President and the Congress pursuant to the Customs Simplification Act of 1954.[4] The Study, along with its First Supplemental Report, was enacted by Congress as the Tariff Classification Act of 1962 (hereinafter the 1962 Act)[5] with the effective date to be ten days from the date of the proclamation of the President.[6] In the interim between approval by Congress and the President's Proclamation, the Tariff Commission was authorized to make certain changes. The *eo nomine* provision for gaskets under which the imported sealing rings were classified by the customs collector was added by the Tariff Commission during that interim.

The gasket provision was introduced in the Third Supplemental Report to the Tariff Classification Study, May 7, 1963, prior to the President's Proclamation of August 21, 1963, declaring the 1962 Act to become effective as of August 31, 1963.[7] The Tariff Commission determined that a change in the 1962 Act was necessary because of a concession made by the United States to the European Economic Community as a result of 1960–61 trade conferences. Presidential Proclamation 3468, 97 Treas.Dec. 157, 334, T.D. 55615, carved a special provision for gaskets out of paragraph 1537 (b), Tariff Act of 1930, which covered manufactures in chief value of india rubber or gutta-percha not specially provided for.

The provisions in the 1962 Act which enabled the Tariff Commission to make changes in the Schedules prior to the

---

3. See generally the opinion of this court in F. L. Smidth & Co. v. United States, 409 F.2d 1369, 56 CCPA 77, C.A.D. 958 (1969), delivered by Judge Nichols.

4. P.L. 83–768, 68 Stat. 1136.

5. P.L. 87–456, 76 Stat. 72.

6. *Id.* § 501.

7. Pres.Proc. 3548, 77 Stat. 1017.

effective date appear in § 101 thereof and read in pertinent part as follows:

(b) Such new title I (hereinafter in this Act referred to as the "Tariff Schedules of the United States") shall consist of—

(1) the general headnotes and rules of interpretation;

(2) schedules 1 to 8 inclusive; and

(3) the appendix to the tariff schedules; * * * and

(4) subject to subsection (c) such changes in the provisions identified in paragraphs (1), (2), and (3) of this subsection as the [Tariff] Commission decides—

(A) are necessary to reflect changes in tariff treatment made by statute or under authority of law, arising either before the date of enactment of this Act or on or after such date of enactment and before the date on which the Tariff Schedules of the United States is published pursuant to subsection (d), or

(B) are otherwise necessary.

\* \* \* \* \* \*

(c) (1) The Commission shall include the changes provided for in subsection (b) (4), together with the reasons therefor, in one or more supplemental reports which shall be promptly published and submitted to the President and the Congress * * *

(2) (A) No change submitted pursuant to the authority contained in subsection (b) (4) (B) shall become effective unless, following the date on which the supplemental report containing such change was submitted to the Congress and before the date on which the Tariff Schedules of the United States is published pursuant

to subsection (d), a period of 60 calendar days of continuous session of the Congress has elapsed.

The 1962 Act further provided:

Sec. 103. The provisions of the Tariff Schedules of the United States as made effective on the date provided by section 501 shall have the status of statutory provisions duly enacted by the Congress * * *.

To understand appellants' attack on the validity of item 773.25, it is necessary to appreciate the inequity appellants perceive to have been perpetrated by the Tariff Commission. Appellants assume that under the Tariff Act of 1930 the imported gaskets would have been classified as parts of agricultural implements and accorded free entry.[8] Appellants further assume that the promulgation of the trade agreement whereby paragraph 1537(b) was amended to specifically name gaskets would not have changed the free status of the imported gaskets. This is because, according to appellants, it is well settled that a trade modification does not effect a change in the tariff treatment of an article, i. e., the modification applies only to articles classifiable under the tariff provision which has been modified.[9] However, the existence of an *eo nomine* provision for gaskets in the TSUS precludes free entry for gaskets as parts of agricultural implements because of TSUS Rule of Interpretation 10(ij) which reads:

a provision for "parts" of an article covers a product solely or chiefly used as a part of such article, but does not prevail over a specific provision for such part.

Appellants thus conclude that the effect of the Tariff Commission addition of the gasket item was to change the tariff treatment of irrigation gaskets rather

---

8. Appellants refer to paragraph 1604, Tariff Act of 1930, which generally corresponds to the free entry item 666.00 which appellants claim to be the proper classification of the imported sealing rings.

9. Appellants rely on United States v. Curly-Bates Co., 46 CCPA 14, 17, C.A.D.

688 (1958); United States v. Canadian National Railways, 29 CCPA 272, 278, C.A.D. 202 (1942); M. Zwiebel v. United States, 58 Cust.Ct. 103, 108, n. 2, C.D. 2898 (1967); Abercrombie & Fitch Co. v. United States, 9 Cust.Ct. 336, 339, C.D. 709 (1942).

than merely the rate of duty assessed thereon in derogation of the aforesaid principle.

We do not reach a discussion of the contended principle regarding trade agreements nor its application to the facts of this case because we find that the change in tariff treatment of irrigation gaskets, if any change occurred, was a result of legislative action in endowing the items in the Tariff Schedule with the status of law duly enacted rather than a result of executive decision. Appellants concede that the action of the President in carving out a specific provision for gaskets from paragraph 1537 (b) was within the authority vested in him by the Congress. The question reduces to whether the action of the Tariff Commission in translating that concession, which itself bore the stamp of "authority of law," into an *eo nomine* provision was within the Commission's scope of authority.

Recalling that the language of § 101 (b) (4) (A) of the 1962 Act, supra, was "such changes * * * as the Commission *decides* * * * are necessary to reflect changes in tariff treatment made * * * under authority of law * * *," (emphasis added), we are aided by the relevant comment of the House and Senate Committees which reads:

> The only changes which can be made in the tariff schedules, after the enactment of the bill, will be those which the Tariff Commission *finds* are required to be made by virtue of legislation, court decisions, or *authoritative administrative decisions*, all of which necessarily must be reflected in the new tariff schedules. (Emphasis added.)[10]

As we said in Amity Fabrics, Inc. v. United States, 435 F.2d 569, 572, 58 CCPA 73, C.A.D. 1006 (1970):

> We believe it clear that the words employed by Congress demonstrate that

it was conferring specific authorization on the Commission to judge and determine whether statutes passed before the date on which the TSUS were finally published constituted changes in tariff treatment which required modification of the TSUS.

The same is true of authoritative administrative decisions, and given such a decision, discretion rested with the Tariff Commission to determine its effect and decide the manner in which it was to be reflected in the pending schedules.

 We accordingly hold that it was within the proper exercise of its authority for the Tariff Commission to create item 773.25 in response to the trade agreement modification. It is because of the item and its interplay with the General Rules of Interpretation that there was a possible change in tariff treatment of which appellants complain, not the trade agreement per se. Moreover, we do not think it was incumbent upon the Tariff Commission to ascertain each and every conceivable change in tariff treatment engendered by each modification proposed by the Commission during the interim before the effective date of enactment by Presidential proclamation. "[A] leading objective of the new schedules was simplification * * *,"[11] the realization of which would have been hampered had the Commission been compelled to meticulously avoid effecting changes in tariff treatment each time it was called upon to react to a trade agreement modification as appellants would apparently have required the Commission to do.

The 1962 Act provided under § 101 (b) (4):

> In its determinations under this paragraph, the Commission shall apply the standards it applied in its report of November 15, 1960 * * *.

Appellants assert that adequate notice of changes to both the Congress and the public was among these standards, and

---

10. H.R.Rep.No.1415, 87th Cong., 2d Sess. 4 (1962); S.Rep.No.1317, 87th Cong., 2d Sess. 4 (1962), U.S.Code Cong. & Admin.News, 1962, pp. 1641, 1644.

11. F. L. Smidth & Co. v. United States, 409 F.2d 1369, 1373, 56 CCPA 77, 82 (1969).

that such *inadequate* notice was given as to mislead the legislature and public. While the Government admits, at least arguendo, that notice may have been an implicit requirement, it also aptly points out that in setting forth the standards it would apply, the Tariff Commission cautioned that:

> With respect to the requirement in section 101(b) of Public Law 768 that in the case of incidental rate changes "the Commission shall specify each incidental change in rate * * * and shall accompany it with a summary of all the data on which such suggested change was based" it should be understood that where changes in terminology are undertaken, every possible change in rate that might result cannot always be foreseen. Moreover, there are uncertainties as to the tariff status of some articles under the existing law. Accordingly, the Commission will be obliged to interpret the instructions in section 101(b) as requiring it to specify each incidental change in rate "to the fullest extent practicable." [12]

This not only reinforces our view that the Commission could not have been expected to anticipate the impact of every proposed modification, but also supports the Government's contention and Customs Court holding that procedural standards were met. There was publication of the fact that changes were to be made in the Tariff Schedules to effectuate the 1960–61 trade agreements, and there was notice that no public hearing had been ordered so that an interested party could request one or submit written comments. In addition, as noted above, Congress had before it the Third Supplemental Report containing this change for several months prior to the date of the President's Proclamation declaring the 1962 Act effective. We are satisfied that both Congress and the public had adequate notice and had ample opportunity to call attention to any inequities perceived as a result of the inclusion of item 773.25. No changes were made, and this provision acquired the status of valid law when the entire TSUS was made effective by Presidential Proclamation.

Finding that the tariff item under which the importations were classified is a valid provision, and that classification thereunder was correct, we affirm the judgment of the court below.

Affirmed.

59 CCPA

---

12. Tariff Classification Study, Vol. 1 at 56.