**JARVIS CLARK CO.,
Plaintiff/Appellant,**

v.

**UNITED STATES, Defendant/Appellee.**

**Appeal No. 83–1106.**

United States Court of Appeals,
Federal Circuit.

May 2, 1984.

Rehearing Denied July 17, 1984.

---

Edward N. Glad, Los Angeles, Cal., for appellant.

Michael P. Maxwell, New York City, for appellee. With him on brief were J. Paul McGrath, Asst. Atty. Gen., David M. Cohen, Washington, D.C., Director and Joseph I. Liebman, New York City, Atty. in Charge, International Trade Field Office.

Before KASHIWA and SMITH, Circuit Judges, and WISDOM *, Senior Circuit Judge.

WISDOM, Senior Circuit Judge.

We consider here the proper judicial procedure for resolving an importer's complaint that the Customs Service has improperly classified its merchandise. We hold that the Court of International Trade is required to decide the correctness not only of the importer's proposed classification but of the government's classification as well. Because the trial court did not do so, we reverse and remand.

### I.

This case requires the Court to grope for the proper words for describing an imported product which does not readily fit into the importer's proposed classification or the government's classification of the merchandise.

The items at issue in this case are tippler hoppers. These are mining cars used to haul and dump ores and wastes from underground mines. The cars run on narrow-gauge rails, have no brakes, and are not self-propelled.[1] When the plaintiff, Jarvis Clark Co., imported tippler hoppers from South Africa between May 1980 and Febru-

---

* The Honorable John Minor Wisdom, Senior Circuit Judge, United States Court of Appeals for the Fifth Circuit, sitting by designation.

1. The parties stipulated to the following descriptive facts:

   "The tippler hoppers are designed for and used only to haul earth, minerals, or ores out of underground mines. The said tippler hoppers run on rails laid in underground mines. The tippler hoppers are not self-propelled.

   The standard gauge for railroad and railway rolling stock in the United States is 4 feet 8½ inches. The gauge of the tippler hoppers imported by the plaintiff is either 20 inches, 30 inches, or 36 inches. The tippler hoppers imported by plaintiff are not equipped with brakes and do not conform to all safety standards promulgated for railroad cars."

   *Jarvis Clark v. United States,* 566 F.Supp. 344, 345 (C.I.T.1983) (sentence numbering omitted).

ary 1981, it created a problem in legal semantics for the Customs Service. The Service classified the tippler hoppers under item 690.15 of the Tariff Schedules of the United States (TSUS), as "Railroad and railway rolling stock: Passenger, baggage, mail, freight and other cars, not self-propelled", and assessed a duty of 18 percent. The plaintiff had difficulty in thinking of its imported product as railway rolling stock and sued in the Court of International Trade, alleging that the tippler hoppers should have been classified under TSUS item 664.08, which covers "Mechanical shovels, coal-cutters, excavators, scrapers, bulldozers, and other excavating, levelling, boring, and extracting machinery, all the foregoing, whether stationary or mobile, for earth, minerals, or ores: pile drivers; snow plows, not self-propelled; all the foregoing and parts thereof: ... Other." The duty for item 664.08 is 4.4 or 4.7 percent, depending on the date of importation.

On cross-motions for summary judgment, the trial court held in favor of the government. *Jarvis Clark Co. v. United States*, 566 F.Supp. 344 (C.I.T.1983). The court did not consider the correctness of the government's classification. Instead, it found the plaintiff's proposed classification incorrect and concluded, "Plaintiff has failed to overcome the classification of customs under Item 690.15."

The court found item 664.08 inappropriate for two reasons. First, it examined heading 84.23 of the Brussels Nomenclature,[2] the heading corresponding to TSUS item 664.08. Heading 84.23 covers

"Excavating, levelling, tamping, boring and extracting machinery, stationary or mobile, for earth, minerals or ores (for example, mechanical shovels, coal-cutters, excavators, scrapers, levellers, and bulldozers); pile-drivers; snow-ploughs, not self-propelled (including snow-plough attachments)."

The explanatory notes state,

"This heading covers machinery, other than agricultural machinery (heading 84.-24) for 'attacking' the earth's crust (e.g.,: for cutting and breaking down rock, earth, coal, etc.; earth excavation, digging, drilling, etc.), or for preparing or compacting the terrain (e.g., scraping, levelling, grading, tamping or rolling). It also includes pile-drivers, snow-plough attachments and non-self-propelled snowploughs."

4 *Explanatory Notes* 1237. Because tippler hoppers are not used for "attacking the earth's crust", but rather for carrying materials out of the mine after the materials have been severed from the earth, the court concluded that item 664.08 is inapplicable.

The court also relied on TSUS Schedule 6, Part 4, Subpart B, Headnote 1(i). This headnote provides,

"This subpart does not cover—

(i) cranes and other machines mounted on vehicles, on vessels or other floating structures, or on other transport equipment (see part 6 of this schedule). . . ."

The Explanatory Notes to the Brussels Nomenclature, heading 84.23, similarly provide that

"Excavating, etc., machines are classified in heading 86.06 if they are mounted on wagons or trucks, of a kind suitable for

---

**2.** Customs Co-Operation Council, *Nomenclature for the Classification of Goods in Customs Tariffs* (5th ed. 1976) [Brussels Nomenclature], and *Nomenclature-Explanatory Notes* (2d ed. 1966) [*Explanatory Notes* ]. The Brussels Nomenclature

"was put forth by the Customs Cooperation Council, an international organization, for adoption by its member nations, with the idea that their tariff items might be made uniform in phraseology, even if the rates were different and this phraseology, becoming familiar, would help trade by reducing the uncertainty

of exporters as to how their exports would fare with the customs of trading partners." *F.L. Smidth & Co. v. United States*, 409 F.2d 1369, 1375 (C.C.P.A.1969). Congress did not adopt the Nomenclature, but the Tariff Commission did follow much of its phraseology and the Nomenclature is often cited when clarification is required. *Id.* The predecessor to the Court of International Trade has held that the superior heading to item 664.08 is substantially the same as heading 84.23 of the Brussels Nomenclature. *Servco Co. v. United States*, 68 Cust.Ct. 83, 90 (1972), *aff'd*, 477 F.2d 579 (C.C.P.A.1973).

coupling into a train running on a railway network of any gauge.... On the other hand, excavating, etc. machines mounted on trucks or platforms not meeting the specifications of true railway rolling stock remain classified in [heading 84.23]."

4 *Explanatory Notes* 1237.[3]

The plaintiff argues that a tippler hopper is not "a machine mounted on a vehicle", because it has only one moving part. The court found, however, that if this were true, item 664.08 would be inapplicable because that item covers only "machines". The court did not address the plaintiff's argument that a tippler hopper is a "machine" but not a "machine mounted on a vehicle".

## II.

A presumption of correctness attaches to a classification by the Customs Service, and the importer[4] has the burden of proving that the classification is incorrect. 28 U.S.C. § 2639(a)(1) (Supp. V 1981); *E.R. Hawthorne & Co. v. United States*, 730 F.2d 1490 (Fed.Cir.1984); *United States v. H.M. Young Associates, Inc.*, 505 F.2d 721, 724 (C.C.P.A.1974). To give effect to this presumption the courts have long imposed a "dual burden" of proof: the importer must prove not only that the government's classification is incorrect but also that the importer's proposed classification is correct. *E.g., United States v. A. Johnson & Co.*, 588 F.2d 297, 301 (C.C.P.A.1978); *United States v. New York Merchandise Co.*, 435 F.2d 1315, 1318 (C.C.P.A.1970); *United States v. Danker & Marston*, 2 Ct.Cust.App. 462, 464 (1912); *Tiffany v. United States*, 105 F. 766, 767 (S.D.N.Y. 1901). The rule apparently arose out of the formalities of pleading: an importer could prevail in a protest only if it pleaded the proper alternative classification, and

the importer carried the burden of proving the facts pleaded. *Arthur v. Unkart*, 96 U.S. 118, 122–23, 24 L.Ed. 768, 770 (1878); *Fisk v. Seeberger*, 38 F. 718, 719–20 (N.D. Ill.1889). The purpose of this rule was to ensure that the government could consider the alternative and ascertain facts sufficient to accept or refute it. *Davies v. Arthur*, 96 U.S. 148, 151–52, 24 L.Ed. 758, 759 (1878); *Bliven v. United States*, 1 Ct. Cust.App. 205, 208 (1911). The dual burden has also been explained as necessary to "the orderly administration of customs law". *New York Merchandise Co.*, 435 F.2d at 1318. The tariff schedules are so structured that many articles could fall under several different classifications, while others do not fit any classification perfectly; the decision of the Customs Service was considered correct until the importer pointed to a better classification.

The dual burden can, however, lead to unfair results, since it requires the court to affirm an incorrect government decision when the importer has failed to establish a correct alternative. When the Customs Service is unable to determine where an item belongs in the tariff schedules, it is anomalous to demand that the importer provide the correct answer. Moreover, the stability of the customs laws may be better served by a requirement that the Court of International Trade determine the correct classification for an item—rather than affirming an incorrect result because the importer's alternative is wrong—so that all future importers will know what the correct classification is. The desire for "uniform and consistent interpretation and application" of the customs laws is central to customs policy. H.Rep. No. 1235, 96th Cong., 2d Sess. 29, *reprinted in* 1980 U.S. Code Cong. & Ad.News 3729, 3741 [House Report], quoting Chief Judge Re. Waste is

---

**3.** The provisions cross-referenced in the headnote and explanatory note (TSUS Schedule 6, Part 6, and Nomenclature heading 86.06, respectively), both refer to railway rolling stock; however, as we note in part IIIA of this opinion, it is clear that tippler hoppers fall under Nomenclature heading 86.07, not 86.06.

**4.** Under § 516 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516 (1982), a domestic interested party may also challenge a classification decision. For convenience this opinion uses the term "importer" to refer to any challenger of a government classification.

avoided and the goals of the tariff laws are best promoted when importers know with some certainty how their imports will be classified and taxed before they import the goods.[5]

When Congress created the Court of International Trade in 1980, it granted that court the power to order certain remedies previously unavailable to the Customs Court. The Customs Courts Act of 1980 provides,

"(b) If the Court of International Trade is unable to determine the correct decision on the basis of the evidence presented in any civil action, the court may order a retrial or rehearing for all purposes, or may order such further administrative or adjudicative procedures as the court considers necessary to enable it to reach the correct decision."

28 U.S.C. § 2643(b) (Supp. V 1981). The legislative history demonstrates that the principal purpose of this provision was to alleviate the unfairness of the dual burden of proof. The House Report states:

"Subsection (b) is a new provision that empowers the Court of International Trade to remand the civil action before it for further judicial or administrative proceedings. In granting this remand power to the court, the Committee intends that the remand power be coextensive with that of a federal district court. In addition, this subsection authorizes the court to order a retrial or rehearing to permit the parties to introduce additional evidence.

"Subsection (b) has particular impact on civil actions brought pursuant to section 515 or 516 of the Tariff Act of 1930. Under existing law, for example, in a civil action commenced under the court's jurisdiction to entertain cases involving the classification or valuation of merchandise, if the plaintiff succeeds in demonstrating that the original decision of the Customs Service was incorrect but is unable to establish the correct classifica-

tion or valuation, the court dismisses the civil action. In effect, the court holds in favor of the United States even though the plaintiff has demonstrated that the challenged decision of the Customs Service was erroneous. Subsection (b) would permit the court in this situation to remand the matter to the Customs Service to make the correct decision or to schedule a retrial or rehearing so that the parties may introduce additional evidence."

House Report at 60–61, 1980 U.S.Code Cong. & Ad.News at 3772. By granting the power to remand or to retry an action, § 2643(b) eliminates the dual burden's potential for unfairness while providing the government an opportunity to develop evidence as to classifications not previously considered.

The government argues that § 2643(b) is only a grant of general equity powers and was not intended to have any effect on the burden of proof faced by an importer. But it is clear that Congress intended to alter the existing procedure for classification and valuation protests. As initially drafted, § 2643(b) applied *only* to such protests. The Subcommittee on Monopolies and Commercial Law of the House Judiciary Committee later expanded the statute to apply to "any civil action". *See* House Report at 40–41, 1980 U.S.Code Cong. & Ad.News at 3752; S.Rep. No. 466, 96th Cong., 1st Sess. 20 (1979). But the House Report acknowledges that the provision was directed mainly at the dual burden of proof. The government also argues that, because the statute provides that the court "may" order retrial or remand, the power to remand is discretionary and need be exercised only in "special circumstances" where "the interests of justice might warrant a remand". Brief of Defendant/Appellee at 10. Nothing in the statute or legislative history indicates that the court has a duty to reach a correct result only in "special circumstances". *See House of Adler, Inc. v. United*

**5.** This desire for certainty is the same motivation that led, for example, to the development of the Brussels Nomenclature so that the terminology used in different countries might be uniform and predictable for importers. *See* note 2.

*States,* 2 C.I.T. 274, 277–78 (1981). The statute is more logically interpreted as mandating that the court reach a correct decision in every case; but the statute leaves to the court the discretion whether it should remand for further proceedings or should reach the correct decision on its own. Remand may not always be the appropriate means for finding the right answer; however, whether the court remands, conducts its own hearing, or simply examines the law and the tariff schedules on its own initiative, it is required to reach a *correct* result.

■ The government notes that 28 U.S.C. § 2639(a)(1) (Supp. V 1981) reaffirms that a presumption of correctness attaches to a Customs Service decision, and the House Report states that § 2639(a)(1) "restat[es] existing law". House Report at 58, 1980 U.S.Code Cong. & Ad.News at 3770. The *dual* burden of proof, however, is not mentioned in § 2639(a)(1) or its legislative history. The legislative history mentions the dual burden only in connection with the remand and retrial provisions of § 2643(b). The clear intent of Congress was to change the operation of the dual burden by requiring the Court of International Trade to reach a correct result. This requirement is not inconsistent with the presumption of correctness embodied in § 2639(a)(1). The importer still has the burden of establishing that the government's classification is wrong. Ordinarily it will be difficult to meet this burden of proof without proposing a better classification. But the trial court cannot determine the correct result simply by dismissing the importer's alternative as incorrect. It must consider whether the government's classification is correct, both independently and in comparison with the importer's alternative. In some cases, the government's classification may be so patently incorrect that the importer can overcome the presumption of correctness without producing a more satisfactory alternative. In other cases, the importer's alternative may have faults and yet still be a *better* classification than the government's. In either case, the court's duty is to find the *correct* result, by whatever procedure is best suited to the case at hand.[6]

### III.

■ In the present case the trial court did not consider the correctness of the government's classification, either independently or in comparison with the plaintiff's proposed alternative. It should have done so. Although, as the trial court found, there are problems with the plaintiff's proposed alternative, that alternative is clearly a *better* classification than the government's.

### A.

The Brussels Nomenclature classifies vehicles according to whether they travel on rails or guide-tracks (chapter 86), land or land and water (chapter 87), or water or water and ice (chapter 88). Chapter 86 covers not only true railway cars but also *all* cars that run on rails. Mining wagons and automatic unloading wagons are classified, along with railway freight cars, under heading 86.07, "railway and tramway goods vans, goods wagons and trucks". The explanatory notes state that heading 86.07 includes not only "vehicles for the transport of goods on railway networks (of any gauge)" but *"also* small vehicles or trucks for transport of goods by rail, in mines, on building sites, in factories, warehouses, etc." 4 *Explanatory Notes* 1480 (emphasis added). It is therefore apparent that although tippler hoppers may be clas-

---

**6.** In two cases decided after the effective date of the Customs Courts Act of 1980, this Court's predecessor referred to elements of the dual burden of proof. *Nippon Kogaku (USA), Inc. v. United States,* 673 F.2d 380, 382 (C.C.P.A.1982); *United States v. Miracle Exclusives, Inc.,* 668 F.2d 498, 500 (C.C.P.A.1981). The effect of the 1980 Act was not argued by the parties, nor considered by the Court, in either case. Furthermore, in neither case was the dual burden rule necessary to the Court's decision. Our decision today does not impair the authority of the holding in either case. To the extent that this decision conflicts with dicta in those cases, this decision controls.

sified under heading 86.07 they are *not* "railway rolling stock".

TSUS item 690.15, by contrast, covers "Railroad and railway rolling stock: Passenger, baggage, mail, freight and other cars, not self-propelled." The government argues that this classification is based on the Brussels Nomenclature. The government argues that "railroad" in TSUS is equivalent to "railway" in the Nomenclature while "railway" in TSUS corresponds to "tramway" in the Nomenclature. The government points to dictionary definitions of "railway" as "a rail-line with lighter weight equipment ... than a main-line railroad", "any line of rails forming a road for flanged wheel equipment", and "tramway". The plaintiff, on the other hand, argues that "railway" is either synonymous with "railroad" or refers to light-rail passenger lines (e.g. streetcars and trolleys).

The particular choice of words in TSUS suggests that TSUS is not intended to follow the Brussels Nomenclature. If the drafters of TSUS meant to copy the Nomenclature, they would have been more likely to use the terms "railway and tramway" rather than to use "railway" to mean "tramway". The use of the term "railway", rather than "tramway", may have indicated an intent to include streetcars and trolleys, but *not* small mining and factory wagons, within item 690.15.

Because of the varying meanings of "railway" and "tramway" in Europe and America, comparisons between TSUS and the Nomenclature are unilluminating. When item 690.15 is read without reference to secondary sources, however, it is clear that tippler hoppers are not included. Item 690.15 includes "passenger, baggage, mail, freight and other cars". The natural reading of item 690.15 is that it includes what people customarily think of as railroad cars or trolleys. Tippler hoppers are not "freight cars", nor are they like the other cars on the list. They cannot be coupled with other types of cars to run on a railway, nor are they intended for such purposes; they have no air brakes; they do

not conform to federal railway safety requirements.

The government counters that tippler hoppers are like the other cars listed in item 690.15 because "all are rolling stock with flanged wheels which run on rails". Brief for Defendant/Appellee at 24. The government's position is succinctly stated in the affidavit of its expert witness, an officer of a domestic mining-equipment manufacturer, who declares, "cars such as ... the hopper cars ... are considered by the trade to be railway rolling stock because they run on rails". Affidavit of Richard S. Button, Appellant's Appendix at 28. In other words, the government's position is that everything that runs on rails is railway stock. We disagree. The Tariff Classification Study and the legislative histories of earlier tariff schedules shed no light on the meaning of "railroad" or "railway". Nevertheless it seems likely that the highly protectionist 18 percent tariff on railroad rolling stock—by far the highest Column 1 (favored nation) tariff on any type of transportation equipment—was intended to protect the troubled American railroad industry, not American manufacturers of mining equipment. To extend item 690.15 to include items such as tippler hoppers would do violence to the common understanding of the terms "railroad" and "railway" and would place an unforeseen, undesirable, and unnecessary burden on the international trade in mining cars.

### B.

The trial court relied heavily on the provisions of Brussels Nomenclature heading 84.23 and on the headnote to item 664.08 for its conclusion that tippler hoppers are not "excavating and extracting machinery". The Nomenclature indicates that heading 84.23 covers only machinery that "attacks" the earth. The plaintiff argues, however, that item 664.08 should be interpreted more broadly than heading 84.23 because the Nomenclature specifically provides for mining wagons elsewhere (in heading 86.07) while TSUS does not. The plaintiff also argues that the TSUS head-

note does not exclude tippler hoppers because they are not machines mounted on vehicles.

Both of these arguments have some merit. Because mining wagons are not grouped with railway cars in TSUS as they are in the Nomenclature, it is possible that they should be classified as mining machinery rather than as vehicles. And the plaintiff is correct that the TSUS headnote does not literally exclude tippler hoppers. That headnote excludes "cranes or other machines mounted on vehicles". The plaintiff argues that a tippler hopper is not a machine mounted on a vehicle but rather that the vehicle itself is the machine. The trial court erroneously interpreted this argument as an assertion that a tippler hopper is not a machine at all. Although a tippler hopper is both a machine and a vehicle, it may not be a "machine mounted on a vehicle": it is hard to imagine what purpose a tippler hopper without wheels could serve. It is also worth noting that the headnote's counterpart in the Brussels Nomenclature emphasizes that "machines mounted on trucks or platforms not meeting the specifications of true railway rolling-stock remain classified in [heading 84.23]". 4 *Explanatory Notes* 1237.

Item 664.08 better describes tippler hoppers than does item 690.15. Those in the trade would be far more likely to describe tippler hoppers as "mining machinery" than as "railway cars", if only because hardly anyone would be likely to describe them as "railway cars". Even the government's expert witness, perhaps inadvertently, referred to bottom-dump hopper cars as "mining equipment" before averring that they were "railway rolling-stock". Affidavit of Richard S. Button, Appellant's Appendix at 27. We also note that in an abstracted administrative decision, hopper loaders with rubber tires were held to be excavating or extracting machinery. T.D. 66–56(b), 101 Treas.Dec. 170 (March 1, 1966). The courts are not bound by this decision, but it does suggest that "excavating and extracting machinery", as commonly understood, does not exclude vehicles for hauling ores, notwithstanding the provisions of the Brussels Nomenclature.

In short, item 664.08 is a *better* classification for tippler hoppers than is item 690.-15, even though item 664.08 may eventually prove to be incorrect as well. The plaintiff therefore carried its burden of establishing that the government's classification was incorrect, even though it may not yet have shown the correct answer. Under 28 U.S.C. § 2643(b), the trial court had the duty to find the correct answer by appropriate means.

### C.

If tippler hoppers are not classified under item 664.08, as excavating or extracting machinery, they probably fall under item 692.60, the basket provision for "Vehicles (including trailers), not self-propelled, not specially provided for, and parts thereof". The government argues that tippler hoppers could not properly fall into this category because its counterpart in the Brussels Nomenclature, heading 87.14, encompasses only hand-propelled vehicles, animal-drawn vehicles, and trailers, and tippler hoppers are not trailers. This argument is without merit. Item 692.60 is a basket provision. Although it may be primarily intended to encompass trailers it can certainly encompass mining wagons as well.

The government also argues that because the plaintiff did not mention item 692.60 before the trial court, it cannot do so now. This argument is the dual burden of proof in a different guise. The plaintiff met its burden of showing that the government's classification was incorrect. At that point it was the court's duty to find a correct answer. The plaintiff's failure to cite item 692.60 in the trial court does not preclude the court from considering that classification on its own initiative, nor does it preclude the Customs Service from reclassifying tippler hoppers under item 692.-60 on remand after our determination that

the government's first classification was wrong.[7]

## IV.

We hold that the plaintiff overcame the presumption of correctness and met its burden of showing that the government's classification was incorrect. Either item 664.-08 or item 692.60 better describes tippler hoppers than does item 690.15, and it is possible that other classifications might apply as well. We therefore reverse the decision of the Court of International Trade and remand so that the court may determine the correct result. The trial court may, in its discretion, remand the case for reclassification by the Customs Service or decide the case itself.

REVERSED and REMANDED.

**7.** The government also argues that because this case was submitted on a stipulation that did not include a request for remand, the plaintiff waived its right to a remand. We do not read the stipulation so broadly. The stipulation stated that "the only issue remaining in this action is the proper classification of the Tippler Hoppers". The plaintiff clearly did not waive its right to a correct decision.