**IMPREX, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**No. 89–07–00441.**

United States Court of International Trade.

June 30, 1993.

Quarles & Brady, Matthew J. Flynn and Michael G. Carter, Milwaukee, WI, for plaintiff.

Stuart E. Schiffer, Acting Asst. Atty. Gen. of the U.S., Joseph I. Liebman, Attorney-in-Charge, Intern. Trade Field Office, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice, Bruce N. Stratvert, Edward N. Maurer, Office of Asst. Chief Counsel, Intern. Trade Litigation, U.S. Customs Service, Washington, DC, of counsel, for defendant.

## OPINION AND JUDGMENT

CARMAN, Judge:

Plaintiff, Imprex, Inc., challenges the classification and liquidation of its imported merchandise, the chemical sealant Ultra Seal PC–504, pursuant to section 515 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1515(a) (1988). This Court has jurisdiction under 28 U.S.C. § 1581(a) (1988) and, for the reasons which follow, enters judgment for defendant.

### I. BACKGROUND

#### A. *The Product*

The product at issue in this case is a chemical sealant that plaintiff distributed in the United States between 1977 and 1989 under the trade names Ultra Seal or PC–504. Trial Transcript (Tr.) at 21. PC–504 is a liquid which consists of various thermosetting methacrylate resins derived from esters of methacrylate acid. May 31, 1988 Letter from Robert McWilliam, Imprex Vice President, to Greg Hurley at 1 (Imprex Letter). These resins are hydroxy propyl methacrylate, triethylene glycol dimethacrylate, and lauryl methacrylate. Tr. 61–62. In addition, PC–504 contains an inhibitor, butylated hydroxy toluene (BHT), which prevents the product from polymerizing before use. Tr. at 49. At the time of use, the consumer must add a catalyst to PC–504 in order to trigger the product's polymerization. Imprex Letter at 1.

The primary users of PC–504 are castings manufacturers who apply the sealant to impregnate various goods, including transmission cases, power steering columns, carburetor bodies, and automotive air conditioning compressor bodies. *Id.* at 2. The impregnation process ensures that the castings are pressure tight and free from air and fluid leaks. Pl's Trial Brief at 1. PC–504 achieves these results by filling the pores and cavities of the castings and conforming to the shape of the particular space that it fills. Imprex Letter at 2.

An understanding of the impregnation process is essential to determining the proper classification of PC–504. This process includes several steps which transform PC–504 from a liquid into a hardened, synthetic plastic. *Id.* at 1–2. As previously noted, users must add a catalyst to PC–504 to begin the impregnation process. *Id.* at 1. The user must then immerse the castings in PC–504 and apply a vacuum which draws air out of the castings' pores. *Id.* at 2. As the vacuum removes the air, the liquid fills the pores and conforms to the pores' shape. *Id.* After a period of ten to fifteen minutes, the user must break the vacuum, remove the castings from the vacuum chamber, and drain and rinse the castings in plain water. *Id.* The final step is to place the castings in hot water (195° fahrenheit) for ten minutes in order to polymerize the catalyzed liquid. *Id.* This process "cures" the liquid and causes it to change into a solid plastic plug, the shape of which corresponds to the castings' pores. *Id.*

#### B. *Relevant Statutory Provisions*

Plaintiff relies on the following provisions of the Tariff Schedules of the United States (TSUS), 1986:

1. *Schedule 4, Part 4:* Synthetic plastics materials: Item 445.05 Acrylic and methacrylic acid resins....

2. *Schedule 4, Part 4, Subpart A, Headnote 2:* The term *"synthetic plastics materials[,]"* in this subpart, embraces products formed by the condensation, polymerization, or copolymerization of organic chemicals and to which an antioxidant, color, dispersing agent, emulsifier, extender, filler, pesticide, plasticizer, or stabilizer may have been added. These products contain as an essential ingredient an organic substance of high molecular weight; are capable, at some stage during processing into finished articles, of being molded or shaped by flow; and are solid in the finished article. The term includes, but is not limited to, such products derived from esters of acrylic or methacrylic acid; vinyl acetate, vinyl chloride resins, polyvinyl alcohol, acetals, butyral, formal resins, polyvinyl ether and ester resins, and polyvinylidene chloride resins; urea and amino resins; polyethylene, polypropylene, and other polyalkene resins; siloxanes, silicones, and other organo-silicon resins; alkyd, acrylonitrile, allyl, and formaldehyde resins, and cellulosic plastics materials. These synthetic plastics materials may be in solid, semi-solid, or liquid condition such as flakes, powders, pellets, granules, solutions, emulsions, and other basic crude forms not further processed.

Defendant relies on the following TSUS provisions:

1. Schedule 4 headnotes, (1986):

....

(2)(a) The term "compounds[,]" as used in this schedule, means substances occurring naturally or produced artificially by the reaction of two or more ingredients, each compound—
   (i)   consisting of two or more elements,
   (ii)  having its own characteristic properties different from those of its elements and from those of other compounds, and
   (iii) always consisting of the same elements united in the same proportions by weight with the same internal arrangement.
The presence of impurities which occur naturally or as an incident to production does not in itself affect the classification of a product as a compound.

(b) The term "compounds[,]" as used in this schedule, includes a solution of a single compound in water, and, in determining the amount of duty on any such compound subject to duty in this schedule at a specific rate, an allowance in weight or volume, as the case may be, shall be made for the water in excess of any water of crystallization which may have been in the compound.

3. (a) The term "mixtures[,]" as used in this schedule, means substances consisting of two or more ingredients (i.e., elements or compounds), whether occurring as such in nature, or whether artificially produced (i.e., brought about by mechanical, physical, or chemical means), which do not bear a fixed ratio to one another and which, however thoroughly commingled, retain their individual chemical properties and are not chemically united. The fact that the ingredients of a product are incapable of separation or have been commingled in definite proportions does not in itself affect the classification of such product as a mixture.

(b) The term "mixtures[,]" as used in this schedule, includes solutions, except solutions defined as compounds in headnote 2(b) of this schedule.

2. Schedule 4, Part 2, Subpart D, (1986): Alcohols, polyhydric (including glycols, polyglycols, diols, and polyols), and esters, ethers, and ether-esters and substituted derivatives of any of the foregoing:

....
   Other:

....
Item 428.47   Other....   12.3% ad val.

3. Schedule 4, Part 2, Subpart D, (1986): Mixtures of two or more organic compounds:
   Item 430.10   Mixtures that are in whole or in part of hydrocarbons derived in whole or in part from petroleum, shale oil, or natural gas.

Item 430.20    Other. . . .      3.9% ad val., but not less than the highest rate applicable to any component compound

. . . .

4. Schedule 4, Part 2, Subpart E, (1987): Mixtures not specially provided for:
   . . . .
       Other:
       . . . .
        Other:
        . . . .

   Item 432.28   Other. . . .      3.7% ad val., but not less than the highest rate applicable to any component material[1]

5. Schedule 4, Part 4, Subpart A Headnotes, (1986):
   1. This subpart does not cover synthetic plastics materials provided for in part 1C of this schedule, but the addition of any product described in part 1 of this schedule to a synthetic plastics material described in this subpart as an antioxidant, color, dispersing agent, emulsifier, extender, filler, pesticide, plasticizer, or stabilizer does not affect the classification of such synthetic plastics material in this subpart.

6. Schedule 4, Part 4, Subpart A (1986): Synthetic plastics materials:
   Item 445.05   Acrylic and methacrylic acid resins. . . .

---

### C. *Customs' Classification*

The United States Customs Service (Customs) found that no tariff provision specially provided for the mixture contained in PC–504 and classified the imported product under items 432.28 and 428.47. Def's Brief at 16. Customs determined that the proper tariff treatment depended on the tariff rate applicable to PC–504's component materials because these materials' rate exceeded the 3.7% *ad valorem* rate set forth in item 432.-28. *Id.* at 16–17; Pl's Brief at 4–5. These materials are hydroxy propyl methacrylate and triethylene glycol dimethacrylate, respectively, an ester and ether-ester of polyhydric acid, subject to duties of 12.3% *ad valorem* under item 428.47. Def's Brief at 17.

Plaintiff filed timely protests pursuant to 19 U.S.C. § 1514(a) (1988) contesting Cus-

toms' classification. Customs subsequently denied the protests and, after having paid all liquidated duties, plaintiff commenced this action within the time allowed by law. This Court has jurisdiction under 28 U.S.C. § 1581(a) (1988).

### II. CONTENTIONS OF THE PARTIES

### A. *Plaintiff*

Plaintiff advances two separate arguments in support of its position. First, plaintiff argues that PC–504 is a "synthetic plastics material" within the meaning of Schedule 4, Part 4, Subpart A, Headnote 2 (Headnote 2). Pl's Brief at 3. While plaintiff asserts PC–504 satisfies each part of Headnote 2's definition, the crux of plaintiff's position is that at the time of importation PC–504 contains po-

---

1. In its papers and during trial, defendant relies on item 432.28, TSUS (1987). This provision replaced the former item 432.25, TSUS (1986). This former item reads as follows:

   Mixtures not specially provided for:
      . . . .
       Other:
       . . . .
   432.10      Other . . .      3.9% ad val., but not less than the highest rate applicable to any component material

Because the 1986 and 1987 provisions share the same operative language, i.e. both qualify their respective tariffs according to the "highest rate applicable to any component material," the Court's analysis of the 1987 provision applies equally to entries made before 1987.

lymerized organic material of high molecular weight. Pl's Post–Trial Brief at 10.

Plaintiff adduced expert testimony at trial in support of its position. According to plaintiff's expert, PC–504 must contain polymers from the time of manufacture in order for the product to work as intended. Tr. at 143–44. Plaintiff's expert also testified that polymeric material makes up five to ten percent of PC–504's total composition (Tr. at 149–50) and that this material has a high molecular weight of 2300. Tr. at 115. Though the expert based his testimony on a sample of PC–504 manufactured in 1988 and tested in 1991, plaintiff argues that the sample accurately reflects the composition of the sealant from the date of manufacture. Tr. at 50.

Plaintiff urges that the polymers in the 1988 sample were present as of the time of manufacture and did not develop after importation. Pl's Post–Trial Brief at 12. Plaintiff maintains that polymers could not have developed after manufacture because polymerization of the sealant's components could not have occurred due to the presence of an inhibitor. *Id.* In addition, plaintiff asserts that because the polymerization process increases rapidly once it begins and quickly causes complete hardening, it is improbable that the 1991 test occurred in the midst of the polymerization process. *Id.* Therefore, according to plaintiff, the sample upon which plaintiff's expert based his testimony accurately reflects the presence of polymers in the sealant as of the time of manufacture.

Plaintiff argues further that other tests conducted by plaintiff's expert in 1980 further demonstrate the presence of polymers in PC–504. *Id.* at 13. Plaintiff maintains that while the 1980 test did not attempt to identify polymers, the test nevertheless demonstrated the presence of five percent "other" material. *Id.* According to plaintiff, the presence of five percent "other" material is consistent with the notion that PC–504 contains polymers at the time of manufacture. *Id.*

Plaintiff also claims PC–504 satisfies the remaining elements of Headnote 2. In particular, plaintiff argues that: (1) because PC–504's components contain carbon and hydrogen, PC–504 is organic by definition (*id.*); (2) PC–504 is a liquid that flows into and is shaped by pores and cavities of castings and solidifies in the finished article (*id.* at 10, 14); and (3) PC–504 is derived from an ester of methacrylic acid, a component for which Headnote 2 specifically provides. Pl's Brief at 4.

Plaintiff's second principle contention is that the TSUS interpretive rules required Customs to classify PC–504 under item 445.-05. Pl's Post–Trial Brief at 15. Specifically, plaintiff maintains that the rule of relative specificity compelled classification under item 445.05 because this item describes PC–504 with greater specificity than the provision upon which Customs relied, item 445.05. *Id.* at 15–16.

B. *Defendant*

Defendant contends that Customs properly classified PC–504 under items 432.28 and 428.47, for several reasons. Similar to plaintiff, defendant devotes most of its argument to the issue of whether PC–504 contains polymers at the time of importation. In general, defendant argues that the sealant does not contain polymers at the time of importation and therefore does not satisfy Headnote 2's definition of a "synthetic plastics material." Def's Post–Trial Brief at 18–19. In particular, defendant maintains that the presence of polymers in the product after an end user applies a catalyst is irrelevant to the product's classification because the condition of the product at the time of importation determines the product's classification. *Id.* Defendant also emphasizes that the United States patent application for PC–504, common usage by chemists, the chemical industry, chemical literature, and encyclopedias all regard PC–504's components as monomers and not as polymers. *Id.* at 23.

Defendant asserts further that PC–504 does not satisfy the remaining items contained in Headnote 2's definition of "synthetic plastics material." *Id.* at 19–20. According to defendant, PC–504 is not formed by the condensation, polymerization or co-polymerization of organic materials as required by Headnote 2. *Id.* at 20. Defendant main-

tains that because PC–504 is a mixture of monomeric chemicals, none of the processes described in Headnote 2 could have formed the product. *Id.*

In addition, defendant argues PC–504 does not satisfy Headnote 2's requirement that the product contain an organic substance of high molecular weight as an essential ingredient. *Id.* at 19, 21. According to defendant, even assuming the product contained five to ten percent polymers as plaintiff maintains, the 2300 molecular weight ascribed to those components by plaintiff's expert is low. *Id.* at 21. Moreover, defendant asserts that the polymers in PC–504, if they exist at all, are not essential because they are an unwanted impurity which increases the product's viscosity and renders the product unusable. *Id.* at 24.

Finally, defendant contends the rule of relative specificity is inapplicable to this case. *Id.* at 25. According to defendant, because PC–504 is not a "synthetic plastics material" under Headnote 2, the Headnote and item 445.05 are not as applicable to the product as items 432.28 and 428.47, the provisions under which Customs classified the product. *Id.* As a result, defendant claims that neither Headnote 2 nor item 445.05 merits the application of the rule of relative specificity. *Id.*

## III. Discussion

### A. *Presumption of Correctness*

■ As in all customs cases, a statutory presumption of correctness attaches to classifications by the Customs Service and the party challenging the classification has the burden of overcoming this presumption. 28 U.S.C. § 2639(a)(1) (1988). To determine whether an importer has overcome the statutory presumption, the Court must consider whether "the government's classification is correct, both independently and in comparison with the importer's alternative." *Jarvis Clark Co. v. United States,* 2 Fed.Cir. (T) 70, 75, 733 F.2d 873, 878, *reh'g denied,* 2 Fed. Cir. (T) 97, 739 F.2d 628 (1984).

### B. *Application of Schedule 4, Part 4, Subpart A, Headnote 2*

The controlling question in this case is whether PC–504 is a "synthetic plastics ma-

terial" within the meaning of Schedule 4, Part 4, Subpart A, Headnote 2. Headnote 2 indicates that the term "synthetic plastics material" applies to products with the following characteristics:

(1) The product is formed by the condensation, polymerization, or copolymerization of organic chemicals;

(2) The product contains as an essential ingredient an organic substance of high molecular weight;

(3) The product is capable, at some stage during processing into finished articles, of being molded or shaped by flow; and,

(4) The product is solid in the finished article.

Schedule 4, Part 4, Subpart A, Headnote 2, TSUS, (1986). Because the parties do not dispute whether PC–504 is "capable ... of being shaped by flow" and whether the product is "solid in the finished article," the Court limits its inquiry to the first two characteristics. In particular, the Court must determine the following: (1) whether PC–504 is "formed by the condensation, polymerization, or copolymerization of organic chemicals;" and (2) whether PC–504 "contains as an essential ingredient an organic substance of high molecular weight." For the reasons which follow, the Court concludes that PC–504 does not have these characteristics and, therefore, is not a "synthetic plastics material" under Headnote 2.

Essential to the Court's analysis of plaintiff's claim under Headnote 2 is the meaning of the terms "polymerized," "organic chemical," and "molecular weight." The first term, the adverb "polymerized," derives from the noun "polymerization" which refers to "[a] chemical reaction, usually carried out with a catalyst, heat, or light, and often under high pressure, in which a large number of relatively simple molecules combine to form a chain-like macromolecule." HAWLEY'S CONDENSED CHEMICAL DICTIONARY 939 (11th ed. 1987). The "macromolecule" by-product is otherwise known as a "polymer" and both of these terms "designate high-molecular-weight materials of either synthetic or natu-

ral origin." 14 MCGRAW HILL ENCYCLOPEDIA OF SCIENCE & TECHNOLOGY 138 (6th ed. 1987). According to this definition, the presence of polymers would appear to indicate high molecular weight within the meaning of Headnote 2. The second term, "organic chemical," describes chemicals which contain carbon molecules. *See* 12 MCGRAW HILL ENCYCLOPEDIA OF SCIENCE & TECHNOLOGY 497 (6th ed. 1987). The final term, "molecular weight," denotes "[t]he sum of the atomic weights of all atoms making up a molecule." 11 MCGRAW HILL ENCYCLOPEDIA OF SCIENCE & TECHNOLOGY 339 (6th ed. 1987).

### 1. Polymer Analysis

The threshold inquiry in this case is whether PC–504 contains polymers at the time of importation. The development of polymers in the product as a result of polymerization that may have occurred subsequent to importation is irrelevant for classification purposes. *Cf.* RUTH F. STURM, CUSTOMS LAW AND ADMINISTRATION, § 54.1, at 3 (3d ed. 1991) ("It is the condition of the merchandise as imported which controls classification, not what it is made into after importation....") (STURM). Moreover, because "[t]he polymerization reaction occurs spontaneously in nature," HAWLEY'S CONDENSED CHEMICAL DICTIONARY 939 (11th ed. 1987), plaintiff must also demonstrate that the polymerization reaction began in the merchandise *prior to* importation.

During trial plaintiff sought to demonstrate the presence of polymers in PC–504 through expert testimony. Plaintiff adduced testimony from Richard A. Fermanian, a specialist in poly-analytic chemistry, who analyzed PC–504's chemical composition on five separate occasions between September 1979 and August 1991. Tr. at 21–23. Fermanian conducted the first four tests between September 1979 and February 1981. According to plaintiff's expert, the most accurate of the first four tests revealed that PC–504 contained 53% hydroxypropyl methacrylate (HPMA), 6% diethylene glycol dimethacrylate (DEGDMA), 25% triethylene glycol dimethacrylate (TEGDMA), and 16% other material. *Id.* at 22. Fermanian noted further that the techniques used in the first four tests do not detect polymers or evaluate molecular weight. *Id.* at 22–23.

In August 1991, plaintiff's expert tested PC–504 for the fifth time for the express purpose of determining whether the product contained polymers. *Id.* at 23. According to Fermanian, "[t]his analysis showed that in addition to the monomers found previously, the sample contained 5–10% polymeric material of a higher molecular weight than the rest of the material." *Id.* Plaintiff's expert emphasized that the technique employed for the fifth test, gel permeation chromatography, differed from the techniques used in the previous four tests and was the only one that could evaluate molecular weight. *Id.* at 23–24. Fermanian noted further that only one of the testing techniques employed by Customs' laboratory could detect high molecular weight polymers, but that the results reached by Customs indicated that Customs did not assess molecular weight. *Id.* at 24.

The Court finds that plaintiff's evidence does not persuasively demonstrate that PC–504 contained polymers at the time of importation. As previously indicated, because "[t]he polymerization reaction occurs spontaneously in nature," HAWLEY'S CONDENSED CHEMICAL DICTIONARY 939 (11th ed. 1987), plaintiff must show that PC–504 began to polymerize *prior to* importation to satisfy Headnote 2. The sample used in the fifth test, which Fermanian claimed demonstrated "5–10% polymeric material," came from a shipment that plaintiff received from the manufacturer more than three and one half years before the actual test date. Tr. at 30–31. Though plaintiff appears to have received the shipment on January 5, 1988, Fermanian did not test the sample from this shipment until August 1991.[2] *Id.* at 23, 30–

---

**2.** The Court observes that this interval does not include the additional period from the time the British manufacturer finished its processing to the time plaintiff imprinted the receipt date on the shipment in the United States. While the Court heard testimony indicating that the transit time from the British manufacturer to plaintiff was ten to twenty days, (Tr. at 172) (testimony of Thomas W. Juday, President and owner, Imprex Inc.), the record did not show how long the manufacturer waited before shipping the product after processing or how much time elapsed be-

31. While Fermanian indicated that a three-year-old sample typically retains the same composition it had at the time of manufacture, he also stated that the August 1991 test could not show whether the sample contained polymers at the time of importation or at *any* time other than on the August 1991 test date. *Id.* at 50, 53. Because the August 1991 test does not reveal whether the sample contained polymers at the time of importation and because the spontaneous nature of the polymerization process suggests that the sample could have begun polymerizing either before or after importation, the Court is not persuaded that the subject merchandise contained polymers at the time of importation.

Several other reasons support the conclusion that PC–504 did not contain polymers at the time of importation. First, common understanding in the scientific community as to what constitutes a polymer is contrary to plaintiff's position. By plaintiff's expert's own admission, the ordinary and common understanding in the scientific community is that the material which the expert identified as a polymer, TEGDMA, is actually a monomer. *Id.* at 65–70. This Court must construe tariff terms "in accordance with their common and commercial meanings, which are presumed to be the same." STURM, § 52.6, at 49. Therefore, the fact that plaintiff's expert regards some of PC–504's component materials as polymers in "strict technical terms," but not in the sense of how the term polymer is "normally used," Tr. at 65, 69, precludes the Court from concluding that PC–504 contained polymers at the time of importation.

In addition, plaintiff has not provided any evidence which demonstrates that the five to ten percent of "unidentified polymeric material" consists of polymerized "organic chemicals" as required by Headnote 2. The only evidence received by the Court pertaining to these unidentified materials was the testimony of plaintiff's expert. Plaintiff's expert, however, testified that he did not know what those materials contained or how they formed. *Id.* at 63–64. Without evidence of

these materials' composition or formation, the Court is unable to conclude that PC–504 contained polymers within the meaning of Headnote 2 at the time of importation.

Moreover, the patent application submitted by PC–504's inventor further demonstrates that the product does not contain polymers. The application describes the product as using a "monomer system" rather than a polymer system that would satisfy Headnote 2. *See* Pretrial Order, Exhibit C, at 3. As indicated in the application,

> the invention provides a stable heat curable impregnant for porous rigid articles comprising a liquid substantially wholly (meth)acrylic *monomer* system having at least some polyfunctional *monomer* therein, a peroxy or other free radial catalyst therefor and an inhibitor for the catalyst.... Preferably the monomer system is a (meth)acrylic ester *monomer* system and the ester(s) is at least partly polyfunctional.

*Id.* (emphasis added). Plaintiff offered no evidence to rebut the application's characterization of the product as a "liquid substantially wholly (meth)acrylic monomer system." On cross-examination, plaintiff's expert simply stated that he understood the "monomer system" described in the application to be "methacrylate monomers in broad terms." Tr. at 68. This characterization, when examined in connection with the expert's other testimony, seems to suggest that the patent application supports a finding that the product contains polymers in the narrow, technical sense described by the expert. The Court, however, declines to adopt the technical reading employed by plaintiff's expert and finds that the patent application is further evidence that PC–504 does not contain polymers within the meaning of Headnote 2. Because the Court finds that plaintiff's evidence relating to (1) the tests conducted by its expert, (2) the normal understanding of polymers in the scientific community, (3) the content of the five to ten percent unidentified components, and (4) the patent application, does not show either collectively or individu-

---

tween the time the product arrived in the United States customs territory and the time plaintiff

stamped the product's receipt date.

ally that PC–504 contained polymers at the time of importation, the Court concludes that PC–504 does not qualify as a "synthetic plastics material" under Headnote 2.[3]

2. Molecular Weight and Essential Ingredient Analysis

■ Even assuming the Court were to conclude that PC–504 contained polymers within the meaning of Headnote 2, the Court finds that the product does not meet other requirements imposed by the Headnote. Specifically, the Court finds that PC–504 does not contain "as an essential ingredient an organic substance of high molecular weight" as required by Headnote 2. The testimony adduced by plaintiff indicated that the highest molecular weight for PC–504's components was 2300 and that a weight of 2500 would not be considered high by the scientific community. Tr. at 34–36, 76. Because the scientific community would not regard 2500 as a high molecular weight, it does not appear that the scientific community would consider a weight of 2300 as high. As a result, the Court concludes that PC–504's components do not have a high molecular weight and, therefore, do not satisfy Headnote 2's requirements.

■ With respect to the "essential" ingredient requirement of Headnote 2, trial testimony indicated that the product's relatively high molecular weight components were not "essential" to the product as required by the Headnote. As noted above, PC–504's low viscosity or liquid character is critical to the product's functioning. The user must pour the product into the cavities of the castings being treated in order to fill the castings' pores and conform to the pores' shape. PC–504's liquid quality facilitates these tasks. The testimony of both plaintiff's and defendant's experts clearly indicates that PC–504's low molecular weight components, rather than its relatively higher molecular weight components, account for the product's low viscosity and permit the product to function

properly. *See* Tr. at 34, 231. Other evidence shows that low molecular weight components are necessary to the product because high molecular weight components, which generally indicate the presence of polymers, would give the product greater viscosity and a more solid texture. *See* Pl's Ex. 3 at 3. Because greater viscosity inhibits the product's functioning and high molecular weight components increase the product's viscosity, the Court finds that the product's relatively high molecular weight components inhibit rather than promote the product's proper functioning. As a result, the Court finds that PC–504's relatively high molecular weight components are not "essential" to the product at the time of importation as required by Headnote 2.[4]

### IV. Conclusion

The Court holds that plaintiff has not overcome the statutory presumption of correctness attached to Customs' classification of PC–504 under items 432.28, TSUS (1987), and 428.47, TSUS (1986).

### ORDER

This case having been duly submitted for decision, and the Court after due deliberation, having rendered a decision herein; now, in conformity with said decision it is hereby

**ORDERED** that the classification and assessment of duties by the United States Customs Service under items 432.28, TSUS (1987), and 428.47, TSUS (1986), are sustained; and it is further

**ORDERED** that this action is dismissed.

---

3. In addition, the Court notes that the presence of an inhibitor in PC–504, the express purpose of which is to impede polymerization prior to usage also suggests that the product was designed not to contain polymers at the time of importation. *See* Tr. at 49.

4. Moreover, as suggested above, the fact that PC–504 contains an inhibitor for the express purpose of impeding polymerization prior to usage, further demonstrates that whatever polymers might be present in the product are unwanted impurities and, as such, not essential. *See* Tr. at 49.